502 So.2d 1149 (1987)
Elliott P. BOISDORE
v.
Ben BRIDGEMAN, et als.
No. CA-4602.
Court of Appeal of Louisiana, Fourth Circuit.
January 22, 1987.
*1151 A.D. Freeman, New Orleans, for plaintiff-appellee.
Russell J. Schonekas, New Orleans, for defendants-appellants.
Before GULOTTA, KLEES and BYRNES, JJ.
BYRNES, Judge.
This is an appeal from a judgment finding appellants Ben Daly Bridgeman and Janet Raineri, liable to Elliott Boisdore for fraud and breach of fiduciary duty arising out of two corporate real estate ventures. We affirm in part and reverse in part.
In 1979, Boisdore became interested in purchasing a property which he managed on Governor Nicholls Street in New Orleans. Boisdore claims he retained Bridgeman as his attorney for legal advice concerning the best way to achieve this objective and take advantage of low interest loans and subsidies offered by the city and the federal governments. Bridgeman claims he was asked to join in the project as a partner.
In August 1979, Gilted Wood Inc. was incorporated by Janet Raineri, Bridgeman's secretary, with Bridgeman acting as attorney in the incorporation. The stated purpose of this corporation was to acquire and renovate the Governor Nicholls Street property. Boisdore was named President of the corporation, and all of the stock was issued in his name. At that time, he endorsed the certificates in blank and executed separate blank assignments of the shares. Boisdore claims Bridgeman told him this was necessary so that the stock could be pledged to secure financing. According to Bridgeman, Boisdore put up no money, but was to receive one-third of the corporation in return for finding the property, securing government subsidies and low-interest loans, and carrying out the renovations. Bridgeman claims he was to receive one-third of the corporation's stock in return for rendering legal services and finding investors, and that the remaining one-third was reserved for those investors.
Boisdore denied the existence of such an arrangement and eventually filed suit against the corporation seeking to be recognized as sole owner. He was ultimately unsuccessful in his suit and was declared a one-third owner of Gilted Wood Inc. See Boisdore v. Bridgeman, 439 So.2d 1266 (La.App. 5th Cir.1983), writ denied, 444 So.2d 1221 (La.1984).
Appellants in this case place a good deal of emphasis on this previous appeal, contending that Boisdore's claims of fraud were litigated and rejected therein and should not be considered by this court. We do not agree. A full reading of the Fifth Circuit's opinion reveals that it did not address the issue of fraud. The court's holding was based on its finding that Boisdore was estopped from relitigating the issue of ownership because he had failed to appeal an earlier lower court judgment in which his claim of full ownership of Gilted Wood Inc. had been rejected. See 439 So.2d at 1268.
Appellants also argue that because Boisdore's claims against Bridgeman and Raineri were based on their acts as officers and directors of the corporation, he should have been required to assert those claims in a shareholders' derivative suit. We reject this argument. An examination of the pleadings in this case reveals that Boisdore sued Bridgeman in his capacity as Boisdore's attorney, not in his capacity as a director or shareholder of Gilted Wood. The director of a corporation and a private attorney are not judged by the same standards, and conduct which may be permissable for a director can nonetheless violate an attorney's duty to his client. The mere fact that Birdgeman is both an attorney and a corporate officer does not limit Boisdore to one course of action. He was free to sue Bridgeman in his corporate or private capacity. Under these circumstances the trial court correctly denied appellant's exception of no cause and no right of action which sought to limit Boisdore's rights *1152 against them to a shareholder's derivative suit.
Having disposed of this issue we must now address the threshold question of whether it was established by a preponderance of the evidence that an attorney-client relationship existed between Boisdore and Bridgeman. The jury found that such a relationship was proven at trial.
Bridgeman's appeal to this court does not specify this finding as error nor has the issue been briefed to this court. Under Rules 1-3 and 2-12.4 of the Uniform Rules-Courts of Appeal this question has not been properly preserved for review. See Police Jury of Ascension Parish v. Shaffett, 461 So.2d 1072 (La.App. 1st Cir.1984), Ketcher v. Illinois Central Gulf R.R., 440 So.2d 805 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1220 (La.1984). However, because resolution of this issue is essential to a decision in this case we have nonetheless reviewed the record to determine if an attorney-client relationship was proven.
At trial, Boisdore testified that he had known Bridgeman for some years and went to him for legal advice and assistance in setting up the financing and acquisition of the Governor Nicholls Street property. It seems clear that Bridgeman acted as an attorney in the formation of Gilted Wood. The paperwork was prepared in his law office and Janet Raineri, his secretary, acted as incorporator. However, Bridgeman claims that he performed these tasks as Boisdore's partner, not as his attorney. Because there was no written contract of employment between the parties, the exact nature of their relationship had to be divined from their conflicting testimony and the conduct of their enterprise.
There is no doubt that Bridgeman was the sole legal and financial advisor for the corporation. It is also clear that Boisdore relied on Bridgeman for this advice and viewed Bridgeman as his attorney. The jury, as finder of fact, evaluated the credibility of the witnesses and the circumstances surrounding their activities and concluded that an attorney client relationship existed. Our review of the record in this matter convinces us that the jury's resolution of this issue was not manifestly erroneous. We therefore accept the jury's finding that an attorney-client relationship existed and will now analyze the facts of the case to determine if Bridgeman's conduct violated his duty to Boisdore and constituted fraud.

GILTED WOOD
One of Bridgeman's first acts after the formation of Gilted Wood was to approach Mrs. Mary Helen Bryant concerning the possibility of her "investing" in the corporation. To induce her to do so, Bridgeman, without Boisdore's knowledge or consent, personally guaranteed Mrs. Bryant the return of her investment plus a specified profit within a one year period. Mrs. Bryant ultimately advanced $75,000.00 to Gilted Wood, which permitted the corporation to purchase the Governor Nicholls Street property. As security for her investment Bryant was granted a second mortgage on the property. She also received the remaining one third of the shares in Gilted Wood.
Boisdore testified that because he thought Bridgeman had put up the $75,000.00, he agreed to Bridgeman's request that he sign a continuing guarantee which was blank as to both investor and amount. When Boisdore became aware that Bridgeman had not advanced the $75,000.00, he asked that the investor's identity be revealed to him. Bridgeman repeatedly refused to do so and told Boisdore that this was "private information."
In order to obtain a low interest grant/loan from the Community Improvement Agency (CIA), Gilted Wood was required to obtain an additional $124,000 in financing from private sources. To meet this requirement, Bridgeman produced a loan commitment letter from Carver Development Company (Carver), a corporation wholly owned by Bridgeman. This letter was signed by Bridgeman's secretary Janet Raineri, who was also treasurer of Carver. Bridgeman subsequently prepared a $124,381.00 *1153 collateral mortgage note and a $40,000.00 demand note from Gilted Wood to Carver which Boisdore signed as president of Gilted Wood. This $40,000.00 demand note was apparently used by Carver/Bridgeman to obtain a $40,000.00 loan from Century Bank, the proceeds of which were then advanced to Gilted Wood. It appears from the record that Bridgeman caused Gilted Wood to pay the interest which Carver owed Century Bank on the $40,000.00 loan, then charged Gilted Wood additional interest on the loan it received from Carver and finally charged Gilted Wood interest for payments which he personally made to Century on behalf of Carver.
In spite of the infusion of capital from Bryant and the Carver loan, further funds were required to continue renovation work. During the spring and summer of 1980, Boisdore personally advanced sums totaling $40,000.00 to Gilted Wood and received promissory notes from the corporation as security. The record also shows that Boisdore personally paid $15,000.00 of a $27,000.00 debt owed by the corporation to a contractor who performed work on the Governor Nicholls Street property.
In November 1980, Bridgeman informed Boisdore that certain unspecified interest payments and other indebtedness of Gilted Wood had to be paid. Bridgeman did not identify to whom the payment was due and requested that Boisdore make the checks payable to him. Boisdore, trusting Bridgeman, complied and in his capacity as president of Gilted Wood signed two checks totaling $40,000.00. The record shows that rather than apply these funds to Mrs. Bryant's $75,000.00 demand note, Bridgeman unilaterally decided to use the $40,000.00 to repay the five year loan made by his own corporation (Carver). His explanation for this self serving action was that Boisdore did not tell him which loan was to be paid first.
In May, 1981 Bridgeman informed Boisdore that he wanted to replace the unknown investor in Gilted Wood with another and requested that he execute a new promissory note on behalf of the corporation in the amount of $93,906.25. Boisdore refused when he realized that the first $75,000.00 note had not been paid and that he did not know how the $40,000.00 already paid by the corporation had been used.
In March, 1982 Bridgeman called a shareholders meeting of Gilted Wood, and utilizing a proxy from Mrs. Bryant, ousted Boisdore as president of the company, thus depriving him of any participation in corporate affairs. In June 1982, Bridgeman proposed a buy out of Mrs. Bryant's interest and by December 1982 he had succeeded in acquiring her shares. Bryant's $75,000.00 demand note was acquired by Bridgeman's father after Bridgeman told him that it was available for purchase. Bridgeman then transferred all the remaining shares of Gilted Wood to himself utilizing the certificate assignments which he had induced Boisdore to sign in blank. This was the first time the record ownership of any of these shares was placed in a name other than Boisdore's. Bridgeman's father then proceeded to foreclose on the Governor Nicholls Street property.
The foreclosure proceedings were handled by an attorney who Bridgeman had caused to be made a director of Gilted Wood after Boisdore was ousted. Bridgeman notarized an affidavit used by his father in this proceeding. When citation was served on Bridgeman as new president of the corporation, he allowed a default judgment to be taken, thus placing the corporation's only asset in his father's hands. The attorney then wrote to the Civil Sheriff on behalf of Bridgeman's father instructing him not to seize the rentals from the property, thus allowing the corporation to continue receiving this revenue in spite of the seizure.
A file memorandum, written by Bridgeman and dated January 26, 1982 indicated that Bridgeman had been considering a plan by which he would purchase Mrs. Bryant's second mortgage note, get the holder of the first mortgage to allow foreclosure without calling in that mortgage, then purchase Bryant's shares in the corporation. *1154 Boisdore contends this document showed that Bridgeman's intent all along had been to acquire control of the corporation and its assets.

LONDON AVENUE
In January 1981, before their relationship deteriorated completely, the parties began another venture and formed London Avenue, Inc. for the purpose of acquiring and developing a property on London Avenue in New Orleans. The stock in this corporation was all issued in appellant Janet Raineri's name. The down payment for this property was put up in equal shares by Gilted Wood and Beaumont Properties, Inc., another Bridgeman entity. Boisdore was named president of this corporation and was induced by Bridgeman to sign a $110,000.00 mortgage note on the property in his personal as well as his corporate capacity. Boisdore testified that he did this in reliance on Bridgeman's representation that he would obtain some $700,000.00 to finance development of the property. According to Bridgeman, he asked Boisdore to assume personal liability on the note to increase the confidence of potential investors in the project. Bridgeman, however, did not assume this personal liability.
When zoning difficulties and the failure of Bridgeman to produce the promised funding placed the corporation in financial peril, Boisdore attempted to extricate the corporation from its difficulties by locating a buyer who was willing to pay a price sufficient to discharge the mortgage note and return the down payment made by Gilted Wood and Beaumont Properties. When Bridgeman learned of this he had another attorney write to Boisdore and the prospective buyer informing them that the corporation's charter, which was drafted by Bridgeman, did not give Boisdore the authority to arrange the sale.
Bridgeman admitted at trial that to further assure that Boisdore could not sell the property, he caused a $200,000.00 collateral mortgage to be recorded against the property for the sole purpose of preventing Boisdore from finding a willing buyer. As a result of Bridgeman's actions the sale did not take place and foreclosure proceedings were instituted. When the sheriff's sale did not generate sufficient funds to pay the mortgage, Boisdore was exposed to a potential deficiency judgment.

LIABILITY
At the close of trial, the jury found: 1) that an attorney client relationship existed between Boisdore and Bridgeman; 2) that Bridgeman violated the standard of professionalism, care, and fiduciary duty which attorneys must exercise towards their clients; 3) that Bridgeman was guilty of fraud or violation of fiduciary duty in his treatment of Boisdore and; 4) that Janet Raineri acted in concert with Bridgeman, rendering her liable for any fraud he may have committed.
We have no difficulty in affirming the jury's finding that Bridgeman and Raineri are liable to Boisdore. It is clear from the record that Bridgeman's conduct of his client's business amounted to fraud and fell below the high standards of fiduciary duty which should exist between attorney and client. It is also clear that his secretary actively participated in his actions.
Under C.C. Art. 1953 fraud is defined as:
A misrepresentation or a supression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
C.C. Art. 1957 states that:
Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence.
The record leaves no doubt that Bridgeman misrepresented and concealed the true nature and extent of his interest in Gilted Wood and London Avenue from Boisdore. Although an attorney may deal with his client and acquire an interest in his client's property in exchange for services rendered, his actions should be subjected to the most exacting scrutiny. In such situations, the attorney is under a continuing *1155 duty to fully inform his client of all aspects of the transaction. Matthews v. Spears, 24 So.2d 195 (La.App. 1st Cir.1946). Moreover, when a transaction between attorney and client is attacked, the burden is on the attorney to prove that the transaction was made in the best of faith without disadvantage to the client; that it was fair and equitable; and that the client was fully informed of his rights and so was able to deal with the attorney at arms length. Searcy v. Novo, 188 So. 490 (La.App. 2nd Cir.1939).
In this case, Boisdore was kept in the dark as to vital elements of his attorney's interest and participation in the affairs of both corporations. It is clear from the record that Boisdore relied on Bridgeman to conduct the financial and legal business of the corporation and confined his activities to renovation supervision, collection of rentals, and related activities. It is also clear that Bridgeman withheld and/or misrepresented vital information concerning the financial footing of the corporations. For example, he concealed the identity of the only investor in Gilted Wood from Boisdore for some months. He also concealed the fact that he had personally guaranteed that investor a specified return on her investment within a one year period. These promises, even though made by Bridgeman personally, affected the corporation. Mrs. Bryant's dissatisfaction with the corporation's performance was tied to the expectations which Bridgeman's promises raised in her mind. Boisdore, who was not informed of these promises, had no opportunity to object and without such information could not know whether Bridgeman's advice was in his best interests.
Bridgeman's repayment of the $40,000.00 five year term note to his own corporation (Carver) before the $75,000.00 demand note held by Mrs. Bryant is further evidence that he put his own interest above that of his client. The failure to pay the Bryant note was directly responsible for the eventual loss of the property in foreclosure proceedings. Bridgeman's excuse that Boisdore did not tell him which note to pay borders on the absured and totally ignores his duty to do what was best for his client, or at the very least to advise him as to which loan was being repaid. Bridgeman's acquisition of the Bryant stock and his ultimate acquiescence in a default judgment against the corporation is yet another example of his lack of concern for Boisdore's best interest. Allowing his father to seize the property while arranging for the corporation to collect the rents it generated also shows Bridgeman's intent to gain control of the corporation and its only asset.
As to London Avenue, Inc., Bridgeman's consistent obstruction of Boisdore's efforts to sell the property and recoup the down payments made by both parties is a further indication that he failed to exercise his judgment solely on Boisdore's behalf. The result of Bridgeman's obstructive tactics was foreclosure, loss of the corporation's only asset, and the exposure of Boisdore to a deficiency judgment.
From the foregoing it is clear that Bridgeman misrepresented and suppressed the truth in his business dealings with Boisdore and did so with the intent to obtain an unjust advantage over him. It is also clear that Boisdore was damaged by Bridgeman's actions. We therefore affirm the jury's findings regarding Bridgeman's liability.
Raineri's knowing participation in various aspects of Bridgeman's scheme was, in our opinion, sufficient to justify a finding of liability in her part. Under C.C. Art. 2324:
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person for the damage caused by such act.
There is no doubt that Raineri assisted Bridgeman in the commission of fraud against Boisdore. She acted as incorporator and secretary to both Gilted Wood and London Avenue and was treasurer for Carver Development. As an officer of these corporations she assisted Bridgeman in the furtherance of his designs by acting *1156 as a conduit for his manipulations. For example, at Bridgeman's request Raineri endorsed all the certificates in London Avenue (which had originally been issued in her name) to Bridgeman without complying with the procedures set forth in the corporate charter. She likewise signed the collateral mortgage note which Bridgeman placed on the London Avenue property to obstruct Boisdore's attempt to sell it, also in violation of the corporation's charter. The record is replete with similar examples of Raineri's participation in Bridgeman's activities. We therefore affirm the jury's finding that Raineri is liable to Boisdore.

DAMAGES
We now address the issue of damages. At the close of trial, interrogatories were submitted to the jury. Among the issues addressed by these interrogatories was the measure of Boisdore's damages. The jury awarded Boisdore $70,000.00 for the loss of cash he invested in Gilted Wood, Inc. and $125,000.00 for his loss of equity ownership in that corporation. As to London Avenue, Inc., the jury awarded $48,000.00 for Boisdore's loss of equity ownership. These awards totaled $243,000.00. Raineri was found liable for $2,000.00 of this award. The remainder was assessed against Bridgeman.
The trial then court granted defendants' motion for judgment notwithstanding the verdict under C.C.P. Art. 1811 and reduced the jury's award to $150,000.00 without specifying which awards were reduced or for what reasons. Bridgeman and Raineri, appealed the finding of liability. Boisdore answered the appeal, seeking reinstatement of the jury verdict.
As this court observed in Blum v. NOPSI, 469 So.2d 1117 (La.App. 4th Cir. 1985);
[i]n ruling on a motion for a judgment notwithstanding the verdict, pursuant to LSA-C.C.P. Art. 1810.1 (now substantially reenacted in LSA-C.C.P. Art. 1811), the trial judge considers all of the evidence and reasonable inferences in a light most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the motion should be granted and the trial judge should render a judgment notwithstanding the jury's findings. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions, the motion for judgment N.O.V. should be denied.
Applying this standard to the evidence in this case, we find that the trial court abused its discretion by granting the defendant's motion. The evidence simply was not so overwhelmingly in favor of the defendants that interference with the jury's findings was justified. We therefore reverse the granting of the judgment N.O.V.
Having reviewed the record, we cannot say that the jury's damage awards were an abuse of discretion. The $70,000.00 award for loss of cash invested in Gilted Wood reasonably tracks the evidence presented by Boisdore. This award appears to have been intended to compensate Boisdore for amounts which he advanced to the corporation for various operating expenses during renovation. The fact that Boisdore gave himself promissory notes which he signed as president of Gilted Wood as security for some of these advances does not change the fact that Bridgeman's conduct has made these sums virtually uncollectable. Bridgeman allowed his father to seize the corporation's only asset and thus made it difficult if not impossible for Boisdore to recover his money. Under these circumstances, we cannot say that the jury abused its discretion in making this award.
As to the award for loss of equity ownership, we conclude that this award was intended to compensate Boisdore for the decreased value of his ownership interest in the corporations. The jury must have concluded that Bridgeman's manipulation of both corporations has caused them to decrease *1157 in value. Considering that, due to Bridgeman's conduct, neither corporation has retained the property which was its primary asset the jury's conclusion does not seem unreasonable, and we will not disturb its decision to award damages for loss of equity ownership. Moreover, the amount of damages seems reasonable based on the evidence in the record.
Appellants are incorrect in their claim that Boisdore will get double recovery by receiving an award for loss of cash invested and loss of equity ownership. Boisdore's one third ownership did not arise from cash invested, but from work performed. Thus, return of cash invested is not double recovery in the event the property eventually sells for more than the debt. Moreover, Bridgeman now controls how that cash would be used and it seems unlikely that he will disburse it to the shareholders.
Finally, we note that Raineri should have been held solidarily liable with Bridgeman's under C.C. Art. 2324. Instead, the jury fixed her liability at $2,000.00. However, since neither party has raised this issue by assignment of error or brief, we will not disturb the jury's award against Raineri.
For the foregoing reasons, we reverse the trial court's granting of the judgment N.O.V. and affirm the jury verdict and damage awards. All costs of this appeal are assessed against Ben Bridgeman and Janet Raineri.
AFFIRMED IN PART AND REVERSED IN PART.
GULOTTA, J., concurs.
GULOTTA, Judge, concurring.
I concur in the result.