562 So.2d 920 (1990)
Gilbert J. WATERMEIER and Carol C. Watermeier
v.
John F. MANSUETO, et al.
No. 89-CA-784.
Court of Appeal of Louisiana, Fifth Circuit.
April 11, 1990.
Rehearing Denied July 17, 1990.
Gertler, Gertler & Vincent, M.H. Gertler, New Orleans, for plaintiffs-appellants.
Taormina & Richard, Anthony S. Taormina, Metairie, for defendants-appellees.
Before CHEHARDY, C.J., and GAUDIN and WICKER, JJ.
CHEHARDY, Chief Judge.
Gilbert J. Watermeier and Carol C. Watermeier appeal a judgment dismissing their claim against John F. Mansueto for financial losses arising out of the Watermeiers' purchase from Mansueto of a business known as The Wine Cellar, a retail liquor store.
*921 The following are the facts:
Plaintiffs had never owned a business prior to the transaction at issue here. Mr. Watermeier, who had been employed as service manager of an automobile dealership for a number of years, found himself out of work in September 1985 after the dealership changed owners. He and his wife, Carol Watermeier, began investigating business opportunities with the idea of becoming self-employed. They were interested in a business that would earn them an annual income of at least $50,000.
In response to a newspaper advertisement for sale of a service-station/convenience-store operation, on or about October 15, 1985, plaintiffs contacted Bob Bader, a real estate agent. Bader dissuaded plaintiffs from purchasing the convenience store and redirected their attention to The Wine Cellar, a retail liquor store in Metairie owned by John Mansueto. Bader assured them this was a "great deal," giving them copies of profit and loss statements for the years 1983, 1984 and 1985 that showed profits of the business exceeding $50,000 for each of those years. He also gave them a document titled "Approximate Analysis and Pro Forma Study, Wine Cellar Liquor Store," which is reproduced here:

 APPROXIMATE ANALYSIS
 AND PRO FORMA STUDY
 WINE CELLAR LIQUOR STORE
 This information is based on GROSS SALES figures
 sought for from the income tax returns of the above
 business as supplied by SELLER; the other figures are
 supplied by SELLER on approximation bases were he to
 conduct the business, as he did before. No warranties or
 guarantees of any kind are provided herein, whether express
 or implied by preparer or by SELLER:
 ANNUAL GROSS SALES ...... APPROX.......... $250,000.00
 average profit after mark-up of 35% ...... $087,500.00
 (markup used herein maybe less than
 actual)
 SALES VOLUME FOR THE PERIOD JAN.-SEPT. 1985
 WAS APPROX. $170,000.00.
 GROSS EXPENSES ON ANNUAL BASIS:
 RENT ..................................... $12,900.00
 UTILITIES (MONTHLY BETW. $300-400) $ 4,800.00
 INSURANCE (Liability and contents) ....... 380.00
 does not include theft
 Wages .................................... 7,000.00
 Maintenance .............................. 500.00
 Telephone ................................ 650.00
 Advertising including YELLOW PAGES ....... 3,000.00
 Burglar alarm service .................... 480.00
 GARBAGE COLLECTION SHARED WITH 240.00
 BAR NEXT DOORS
 Miscellaneous and car expenses ........... 4,000.00
 __________
 $33,950.00
 APR. NET AFTER EXPENSES .................. $53,550.00
 __________
 ==========

According to the Watermeiers, Bader told them Mansueto wanted to sell the business because he was aging and had health problems. When the Watermeiers asked to visit the business to observe its operations, Bader told them it would not be a good idea because the store's sales volume might drop off if it became known that the business was being sold. The Watermeiers *922 drove past the store several times and visited the store once, staying for less than an hour to observe. They asked to see copies of Mansueto's tax returns, but he refused, stating his tax returns were confidential and he allowed no one to see them.
Nonetheless, the Watermeiers, impressed by the profit figures they had been shown, decided to buy the business at the offered price of $55,000. They were pressed by Bader to make a quick decision, on the ground that Mansueto needed to sell the business quickly due to his health and that the most profitable time of the year was imminent, the Christmas season.
To raise capital the plaintiffs had to re-mortgage their home. They ultimately borrowed approximately $75,000, comprising the $55,000 purchase price of the liquor store, additional funds for initial operating expenses, and some $9,500 to pay off the original mortgage on their home. At no time did the Watermeiers consult an accountant, an attorney, or an investment adviser regarding the purchase.
The sale took place on October 31, 1985, and the Watermeiers immediately took possession and began operating the business. Both Mr. and Mrs. Watermeier worked in the store, with occasional part-time help. Their sales for November and December 1985 were approximately $64,000, but sales declined steadily thereafter.
In the first quarter of 1986, sales were approximately $23,600; in the second quarter, approximately $19,800; the third quarter, approximately $16,772.09; and for October and November, 1986, the last two months in which they operated the store, approximately $6,454.81. Meanwhile, operating expenses and stock purchases were eating up the store's earnings.
By February 1986, their cash depleted, Mr. Watermeier had decided to accept a position with an automobile dealer in Houma, Louisiana, in order to have money to live on. Thereafter Mrs. Watermeier ran the store during the week and he ran it on weekends. Although the Watermeiers continued to pump money into the store from loans and from Mr. Watermeier's salary from the automobile dealership, the store was losing money.
In November 1986, the Watermeiers ceased operation of The Wine Cellar. They were able to sell some of the furnishings and fixtures, for approximately $12,000, but were left with an inventory of approximately $25,000 in liquor, which they could not sell because their liquor license expired. Eventually they donated the liquor stock to a charity, claiming a $7,500 income tax deduction for the charitable donation.
During the course of the year in which they operated the store, the Watermeiers accidentally discovered copies of Mansueto's 1984 and 1985 state sales tax returns, apparently misplaced by him in a file cabinet he had sold the Watermeiers. Those documents revealed the gross sales figures for the store during that period were much lower than the numbers furnished the Watermeiers prior to their purchase of the business.
In March 1987, the Watermeiers filed this suit, naming Mansueto and Bader as defendants. The plaintiffs alleged they had been fraudulently induced to buy the business by the false figures furnished by the defendants. They sought recovery of the purchase price of the business, damages for loss of income and mental suffering, and recovery of expenses, including attorney's fees and interest.
Bader was never served with the suit, so issue was never joined against him. Following trial on the merits as to Mansueto's liability only, the district court rendered judgment in favor of Mansueto, finding that he was not the cause-in-fact of the plaintiffs' losses and dismissing their suit. The court stated in its reasons for judgment,
"The figures provided in the pro forma statement were simply estimates. The pro forma statement clearly stated that the figures were only an approximation, and gave no warranties or guarantees. Furthermore, other financial data was available to the Watermeiers for their inspection to help aid them in their analysis of whether or not they were making a wise and realistic investment."
*923 From this judgment the Watermeiers have appealed.
Louisiana Civil Code Articles 1953 through 1958 set forth our law on fraud in contracts:
"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." LSA-C.C. art. 1953.
"Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
"This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations." LSA-C.C. art. 1954.
"Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." LSA-C.C. art. 1955.
"Fraud committed by a third person vitiates the consent of a contracting party if the other party knew or should have known of the fraud." LSA-C.C. art. 1956.
"Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." LSA-C.C. art. 1957.
"The party against whom rescission is granted because of fraud is liable for damages and attorney fees." LSA-C.C. art. 1958.
In addition, LSA-C.C. art. 2315 encompasses a cause of action for negligent misrepresentations. In order for that doctrine to apply, there must be a legal duty on the part of the defendant to supply correct information, there must be a breach of that duty, and the breach must have caused damage to the plaintiff. Dohmann v. United Gas Pipe Line, 457 So.2d 307 (La.App. 3 Cir.1984).
While a cause of action for intentional fraudulent misrepresentation as to past or present facts exists in Louisiana, an action for fraud cannot be predicated on unfulfilled promises or statements as to future events. Bunkie Bank & Trust Co. v. Johnston, 385 So.2d 1264 (La.App. 3 Cir.1980).
Although the trial judge made no specific finding of fraud on Mansueto's part, there is no question that the profit figures supplied the plaintiffs were misleading and overstated, while the expenses of running the business were understated. The issuance of the overblown profit statements certainly fits within Article 1953's definition of fraud. On the other hand, as the court pointed out, the pro forma statement clearly stated the figures were approximations and that there was no guaranty or warranty.
A finding of fraud is only a threshold matter, however. The central issue is whether the fraud on Mansueto's part was the cause of the plaintiffs' financial losses.
The plaintiffs unquestionably were naive in business matters. Mansueto and Bader took advantage of their innocence. The plaintiffs, however, failed to investigate fully and failed even to perceive obvious omissions in the information provided them.
(For example, the pro forma approximate analysis contained no estimate for the costs of restocking liquor supplies in the estimate of gross expenses. Had plaintiffs examined the statement more carefully, with even a rudimentary knowledge of operating a business, they should have perceived that expenditures for stock purchases would greatly reduce the bottomline profit figure of $53,550.)
As stated in C.C. art. 1953, fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. Although the maxim "caveat emptor" no longer applies so fully as it once did, it still sends a faint echo through our legal system. Plaintiffs should have been suspicious at the pressure to make a quick sale and at Mansueto's *924 refusal to furnish them proof of the store's profits.
Further, the plaintiffs failed to establish the cause of their losses. The steady decreases in sales could be attributable to factors beyond the defendants' control, such as the declining local economy, dissatisfaction of customers, and the plaintiffs' management of the business.
To recover for lost profits, even in tort, a plaintiff must prove the loss with reasonable certainty, and mere estimates of his loss will not support a claim for lost profits. Haggerty v. March, 480 So.2d 1064 (La.App. 5 Cir.1985).
We cannot reverse the district court's holding that Mansueto's behavior was not the cause-in-fact of the plaintiffs' losses unless we find the court's factual determinations were clearly wrong. On the evidence before us, we are unable to find such manifest error.
For the foregoing reasons, therefore, the judgment is affirmed. Costs of this appeal are assessed against the appellants.
AFFIRMED.