600 So.2d 693 (1992)
DUTTON & VAUGHAN, INC.
v.
Petr L. SPURNEY, et al.
No. 91-CA-1076.
Court of Appeal of Louisiana, Fourth Circuit.
March 26, 1992.
Writ Denied June 26, 1992.
Robert E. Leake, Jr., Donald E. McKay, Jr., Leake & Andersson, New Orleans, for plaintiff.
Eugene R. Preaus, Preaus, Roddy & Krebs, Lawrence J. Ernst, Christovich & Kearney, New Orleans, for defendants.
Kyle Schonekas, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, for intervenor.
Before LOBRANO and ARMSTRONG, JJ., and TREVOR G. BRYAN, Judge Pro Tem.
ARMSTRONG, Judge.
Plaintiff Dutton & Vaughan, Inc. and intervenor Barriere Construction Co., Inc. appeal claiming the trial court committed reversible error by granting summary judgment in favor of defendants, the officers and members of the Management Committee of the Louisiana World Exposition, Inc. (LWE) and their insurer.[1] They claim summary judgment is improper because the evidence on record establishes the existence of genuine issues of material fact supporting their allegations that the LWE Management Committee members' actions constituted fraud. We disagree and, therefore, affirm.
In November 1983, the LWE leased from the Missouri Pacific Railroad (MOPAC) for $2,657,944.80 the land on which it intended to construct the Fair's primary parking facility. The following month, on December 22, 1983, the demolition, excavation and construction contract for this proposed parking facility was awarded to Dutton & Vaughan (D & V) for the price of $2,753,-040.40, plus additional amounts authorized by change orders.
*694 Thereafter, pursuant to a Cooperative Endeavor Agreement (CEA) between the City of New Orleans and the LWE, executed on February 11, 1984, the City furnished the LWE with $3 million "in return for LWE constructing and providing public improvements consisting of parking facilities for the ... Louisiana World Exposition..."[2] One condition stated in the CEA was the City would pay the $3 million "to the LWE after documentation [was] presented covering construction schedule and lease payment schedule (Exhibit B)..." The terms of the CEA also provided the LWE would be responsible for all subsidiary costs of the parking facilities such as garbage disposal, maintenance, repairs and insurance (flood, casualty, fire, etc.). Attached to the CEA as exhibits were both the MOPAC and D & V contracts, their ostensible costs totalling over $5 million.
As a prerequisite to delivering the funds to the LWE, the City required an invoice from the LWE in the amount of $3 million. The LWE complied by producing a blanket invoice. Upon its receipt of the $3 million, the LWE deposited the funds in its general account.
Through this lawsuit, D & V and Barriere, the subcontractor which blacktopped the MOPAC lot, seek from the officers and members of LWE's Management Committee the remainder owed under the primary parking facility construction contract, approximately $1 million, plus attorney's fees. They contend the officers and directors of the corporation are individually liable for the corporation's contractual obligation because the officers and directors intentionally misrepresented that D & V would be paid from the $3 million specifically allocated by the CEA, and wrongfully diverted those specifically allocated funds to other creditors.
On a previous appeal, a five-judge panel of this court determined that D & V and Barriere's petitions set forth a cause of action in fraud. Dutton & Vaughan, Inc. v. Spurney, 496 So.2d 1126 (La.App. 4th Cir.1986), writ den., 501 So.2d 208 (La. 1987) ["The result of the Court of Appeal judgment is correct."]. This court noted that "the fraud alleged by [D & V and Barriere] does not consist of misrepresentations regarding the use of future general revenues; it is the wrongful diversion of public funds which were specifically appropriated for parking facilities, an appropriation which [D & V] allegedly was assured would provide a separate fund of payment of its contract." 496 So.2d at 1130. Therefore, employing the appropriate standard of accepting the facts alleged in the petition as true and determining whether the law affords any relief to the plaintiff if those facts are proved at trial, this court held "the allegations that defendants wrongfully diverted funds earmarked by the City to pay for parking facilities" state a claim for fraud. 496 So.2d at 1129.
Following extensive discovery, the defendants motioned for summary judgment asserting D & V has no evidence which supports its contention that 1) the $3 million provided by the City pursuant to the CEA was dedicated for the payment of D & V's contract; 2) the LWE's failure to segregate the CEA $3 million constituted a fraud against D & V and/or 3) the officers or members of the LWE Management Committee made any of the alleged representations on which D & V claims to have relied. Included among the exhibits attached to the motion were the individual affidavits of the members of the Management Committee which asserted the affiant "made no representations to any representative of Dutton & Vaughan that any funds were allocated to payment of the Dutton & Vaughan contract" and, at the time the D & V contract was signed, the affiant believed revenues and other funding sources would provide income with which to pay *695 contractors.[3] The statement of uncontested facts also declared that none of the defendant Management Committee officials were involved in the CEA negotiations between the City and the CEA, none of them were involved in the decision to deposit the CEA $3 million into LWE's general account, and LWE paid to D & V, MOPAC and SOPAC $3,407,967.92 for parking related expenses.
D & V's opposition explained that its fraud claim is based upon the Management Committee's wrongful spending of the dedicated $3 million for purposes other than construction of MOPAC with actual or constructive knowledge that a) the State/City money was intended for payment of the parking lot construction and/or b) the representation had been made to plaintiff that said funds would be used to pay the D & V contract. It declared that it is irrelevant whether the funds were actually dedicated for the specific purpose of paying D & V's contract because it is the representations to plaintiff that funds would be used to pay its contract which constituted the fraud. The opposition brief, however, admitted that none of the Management Committee members made any misrepresentations to D & V. Rather, it charged Mike Carlson, Vice-president of Site Development for the LWE, and Vanessa Connelly, a City employee and a secretary to Erroll Williams who allegedly made the statements to H.P. Vaughan before Williams became a member of the Management Committee, as the principal persons who made the misrepresentations. The memorandum also made the vague assertion that H.P. Vaughan had general discussions with other LWE employees about the source of payment of his contract, i.e., George Reitmeyer, Ann Brown, and Martin Katz.
D & V's opposition included H.P. Vaughan's affidavit, dated May 30, 1989, which attested that D & V's MOPAC contract with LWE provided that, upon request, LWE would furnish D & V with reasonable evidence that it made financial arrangements to fulfill its payment obligations and, unless such evidence was furnished, D & V was not required to perform its work. He attested he made such a request and was informed by Michael R. Carlson, Vanessa Connelly, George Reitmeyer, Pete Sullivan, John Exnicios, Ann Brown, Paul Creighton, Martin Katz, Bob Chamblee and Deborah Lamensdorfs that "funds dedicated from the City of New Orleans and State of Louisiana were available and would be used to pay my contract." H.P. Vaughan further attested "[a]t no time did any LWE official with whom I had these conversations ever mention to me that the $3 million received by LWE from the City and State would was also to be used for lease payments to [MOPAC or SOPAC], or for any other purpose." He attested he also telephoned the City and was told by the secretary Vanessa Connelly "that the City had received the money from the State but would not release it to LWE until LWE had entered into the parking facility construction contract. I was further told that the money was to go only to the contractor who constructed the parking facility." Thus, based on these representations, H.P. Vaughan attested that his company performed its obligations under the contract. He also attested that as the LWE officials were primarily concerned with opening the Fair on May 12, 1984, "it is clear that defendants intentionally diverted the dedicated funds to more urgent needs while knowing of their dedication *696 and that promises had been made to me that funds would be used to pay my contract."
Subsequently, on January 29, 1991, H.P. Vaughan issued a second affidavit. Through it he attested he was invited to attend the December 28, 1983 LWE Management Committee meeting wherein the construction contract between the LWE and D & V was discussed and approved. He attested, "I specifically recall someone on the Committee asking where the money to pay for this contract was coming from and I remember Petr Spurney responding that it was to be paid from the $3 million coming from the City of New Orleans. This was consistent with everything I had been told previously." Moreover, he attested at "no time did any LWE official nor anyone present at the December 28, 1983 Management Committee Meeting ever mention that the $3 million was also to be used for lease payments to [MOPAC or SOPAC], or for any [other] purpose."
Defendants' reply memorandum emphasized H.P. Vaughan's second deposition, taken on February 6, 1991[4], confirmed that none of the members of the LWE Management Committee present at the December 28, 1983 meeting spoke or directed comments to Vaughan.[5] Rather, it asserted that Vaughan admitted in his second deposition that the statements allegedly made by Spurney were part of a general discussion pertaining to the approval of the D & V contract and that he entered the room unannounced and stood apart from the group participating in the discussion. It asserted that Vaughan also admitted he was uncertain whether Spurney or the other participants in the discussion were aware of his presence. Thus, defendants claim that Vaughan's (eve of hearing on motion) assertions do not support D & V's allegations of fraud because any comments allegedly made by the Management Committee members were not directed at him and, therefore, could not have been intended to influence him or D & V.
On February 19, 1991, the trial court granted the Management Committee members' motion for summary judgment finding no genuine dispute as to the material facts and finding movers were entitled to judgment as a matter of law.[6] In its oral reasons for judgment, the court stated that giving plaintiff all the benefit of the doubt and assuming that the $3 million was earmarked to pay for the services rendered by D & V[7], "at the time the contract was entered into, there was no intention whatsoever to string Mr. Vaughan along and to misrepresent anything to him. The court just feels that taking the whole record together, *697 that a fraud was not committed ... according to the definition of fraud in the code." From this adverse judgment, D & V and Barriere appeal claiming they have shown genuine issues of material fact exist concerning whether the defendants, in their capacities as officers and members of the Management Committee of LWE, received "earmarked funds", made representations that these earmarked funds would pay for D & V's work, and diverted those funds to other uses (with full knowledge of their representations and of the earmarked purpose for those funds). They claim these actions constitute legal fraud and violated the individual defendants' fiduciary obligations under the law and the contract, making them personally liable for the corporation's debt. Thus, they claim summary judgment and the dismissal of their demands were improper. We disagree.
Corporate officers and directors owe a fiduciary duty to their corporation and its shareholders. LSA-R.S. 12:226; LSA-R.S. 12:91. They do not, however, owe such a duty to persons or entities which contract with the corporation. Tahoe Corp. v. P & G Gathering Systems, Inc., 506 So.2d 1336 (La.App. 2d Cir.1987). The members of the Management Committee, therefore, did not owe a fiduciary duty to D & V as a result of the LWE-D & V contractual relationship.[8]
Corporations are distinct legal entities, separate from the individuals who comprise them. LSA-R.S. 12:219; LSA-R.S. 12:93(B); Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164 (La.1991); Bergman v. Nicholson Management and Consultants, Inc., 594 So.2d 491 (La.App. 4th Cir.1992); Kingsman Enterprises, Inc. v. Bakerfield Elec. Co., Inc., 339 So.2d 1280 (La.App. 1st Cir.1976). The liability of corporate officers and directors to third parties is generally determined under the laws of agency or mandate. L.L. Ridgway Co., Inc. v. Marks, 146 So.2d 61 (La.App. 4th Cir.1962). Thus, if the officers and directors do not purport to bind themselves individually, they do not incur personal liability for the debts of the corporation. LSA-C.C. arts. 1983, 1985; Id. Bergman v. Nicholson Management and Consultants, Inc., supra. ["Except for a few limited and generally consent based exceptions, contract duties are owed strictly by and to the parties to the agreement."]; Holley v. Palermo, 461 So.2d 539 (La.App. 3d Cir.1984). A statutory exception to this rule arises when an officer or director, acting through the corporation, defrauds or deceives a third party.[9] LSA-R.S. 12:95; L.L. Ridgway Co., Inc. v. Marks, supra; Altex Ready-Mixed Concrete Corp. v. Employers Commercial Union Ins. Co., 308 So.2d 889 (La.App. 1st Cir.1975), writ den., 312 So.2d 872 (La.1975).
On the previous appeal, this court accepted D & V and Barriere's allegations of fraud as true solely for the purpose of determining whether their petitions stated a cause of action, finding the law would provide them relief if the facts alleged in their petitions were proved at trial. Accord LSA-C.C.P. art. 927. To survive the Management Committee members' motion for summary judgment, however, D & V may not rest on the mere allegations of its pleadings or on claims that the veracity of its allegations were settled on the first appeal. Rather, as defendants' motion is supported by evidence, D & V's affidavits and other receivable evidence must set forth specific facts showing a genuine issue of material fact for trial. LSA-C.C.P. arts. 966, 967; Osborne v. Vulcan Foundry, Inc., 577 So.2d 318 (La.App. 4th Cir. 1991).
The gravamen of D & V's fraud claim is defendants received funds which *698 were specifically allocated to pay D & V's contract and despite that knowledge and the knowledge that D & V had been assured by them that those funds were reserved for it, defendants wrongfully disbursed the funds to other creditors. LSA-C.C. art. 1953 defines fraud as:
[A] misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
The two essential elements of fraud are the intent to defraud or gain an unfair advantage and actual or probable damage. Hall v. Arkansas-Louisiana Gas Co., 368 So.2d 984 (La.1979); Home Indemnity Co., Inc. v. Boe, 499 So.2d 1301 (La.App. 4th Cir. 1986); Automatic Coin Enterprises, Inc. v. Vend-Tronics, Inc., 433 So.2d 766 (La. App. 5th Cir.1983), writ den., 440 So.2d 756 (La.1983). Fraud, however, cannot be predicated on unfulfilled promises or statements as to future events. Wright Bros. Corp. v. Colomb, 517 So.2d 1194 (La.App. 4th Cir.1987), writ den., 519 So.2d 110 (La. 1988); Watermeier v. Mansueto, 562 So.2d 920 (La.App. 5th Cir.1990); Automatic Coin Enterprises, Inc. v. Vend-Tronics, Inc., supra. [fraud, however, may be predicated on promises made with the intention not to perform at the time the promise is made]; Green v. Louisiana Highway Commission, 3 So.2d 236, 238-9 (La.App. 1st Cir.1941) ["the mere failure to do what one promises in order to induce another to sign a contract is not fraud but a mere breach of promise"]. Thus, D & V's case is dependent on its proof of intent and damages, and its proof of intent is dependent upon the accuracy of its claim that the funds were in fact earmarked for payment of its contract and were then wrongfully disbursed in light of that knowledge.
The language of the CEA, however, disproves D & V's opinion and demonstrates the $3 million was not designated solely for payment of the MOPAC construction contract. Moreover, defendants' uncontested summary judgment evidence shows the CEA funds were properly spent.
The CEA professes to furnish the LWE with $3 million in return for "constructing and providing" "parking facilities" for the Fair and defines "parking facilities" as the Superdome, Westbank and MOPAC lots. This language explicitly refutes that the funds were to be used only for the MOPAC lot, much less only for construction. LSA-C.C. arts. 2046, 2047. Therefore, in context with the MOPAC lease and D & V contract which were attached as exhibits, the wording of the CEA manifests that the parties to the agreement anticipated the use of the funds for items other than a single construction contract for one of the three parking lots.
The deposition testimony of Petr L. Spurney, CEO of the LWE, accords this interpretation.[10] He explained that the Carter administration made $100 plus million available to the City of Knoxville for its World's *699 Fair, but the Reagan administration did not provide New Orleans any funds. Therefore, to obtain the funding for the City's needed capital improvements, Mayor Morial petitioned the Louisiana Legislature for $70 million. The Mayor's list of essential improvements was subsequently whittled down. Eventually, the City received a $15 million State loan; $12 million of which the City retained for resurfacing streets and sidewalks, while $3 million was extended to the LWE for parking facilities. Spurney declared "[t]hose funds were for payment of or reimbursement of expenses associated with parking." In response to the query, "Reimbursement of whom?", Spurney responded, "LWE. If we had spent things for parking before those funds were received, it could be a reimbursement. In other words, it was parking, quote, unquote." Moreover, when questioned about the Management Committee's approval of the D & V contract, Spurney acknowledged that the committee would have inquired as to the source of the funds for such a sizeable contract. And, when asked "in this particular case, the source of the funds was known to be $3 million from the City of New Orleans, wasn't it?", he responded, the "source of the funds would have included the $3 million from the City."
Nevertheless, even if the funds had been earmarked for payment of D & V's contract, the Management Committee members' individual affidavits illustrate their lack of intent to gain an unjust advantage over D & V.[11] All of the committee members averred they believed the general revenues of the Fair and other funding sources would provide the income with which to pay the D & V contract and made no representations to D & V that "funds were allocated" to pay its contract. No corroborative evidence supports D & V's assertion that the Management Committee members intended to defraud or to obtain an unjust advantage over it in order to insure its performance of its contractual obligations.
Furthermore, Spurney indicated the LWE had an exotic management system and, under it, there were no major payment schedule problems until "April or May [1984] where all of a sudden [contractors] came over the projections in order to get the Fair finished in time [for May 12, 1984]." He attested that the April invoices, due to be paid on May 20, 1984, were the first to become delinquent. He also denied holding any strategy sessions with the LWE employees who were in contact with D & V to provide advice about dealing with scuttlebutt on the Fair's financial problems. He admitted, however, that the Management Committee discussed the issue of the delinquent April invoices and he described the session as follows: "The feeling in the management committee meeting simply was that we were going to be late with the final payment to the contractors because attendance would generate those monies and, at worst, we would be late in making the payment, but the contractors would be paid, and I would have assumed that everyone felt that way, and that would have been transmitted, because at that point, that was what we felt was going to happen." Thus, the evidence merely shows the Management Committee misjudged its ability to accumulate sufficient funds to satisfy all of its outstanding obligations which, especially in the context of defendants being corporate officers and directors, does not constitute intent to defraud. Cf. Fuller v. Barattini, 574 So.2d 412 (La.App. 5th Cir.1991).
Additionally, no evidence supports D & V's claim that defendants disbursed CEA funds to other than its rightful creditors. When quizzed about what he did to insure that the $3 million was expended only for parking improvements, Spurney stated that "our organization was such that the chief financial officer knew that, the legal officer knew that, the construction vice president knew that, and there was no reason and is no reason for me to feel to this day that it was not handled otherwise." He continued that, "[i]t is [his] understanding that LWE *700 spent $3 million received from the City for parking."[12] Moreover, Spurney and the other defendants' statement of uncontested facts confirms the LWE spent $3,407,-967.92 for parking related expenses.
The record is also void of any evidence showing the Management Committee members had actual knowledge of D & V's appreciation of the CEA and/or used it to gain an unjust advantage, or concealed material facts from D & V with the intent to deceive. See Greene v. Gulf Coast Bank, 580 So.2d 712 (La.App. 3d Cir.1991), rev'd, 593 So.2d 630 (La.1992). D & V's summary judgment evidence suggests that if H.P. Vaughan had a misimpression about the use of the CEA funds, the Management Committee should have realized he was operating under that misimpression and should have taken steps to enlighten him as to its proper meaning. See LaCaze v. State, Through DOTD, 541 So.2d 322, 328 (La.App. 3d Cir.1989) [dissent], writ den., 546 So.2d 1224 (La.1989). The Management Committee members, however, owed D & V no duty to ascertain its individual understanding of the CEA.[13]
The legal effect of the document was not concealed and was easily discoverable. LSA-C.C. art. 1954 contains the rule that fraud does not vitiate consent when the party against whom a fraud is directed could have ascertained the truth without difficulty, inconvenience or special skill. Thus, even if the Management Committee members had concealed from D & V material facts, a supposition without any evidentiary support, the cause of D & V's damages would be its own failure to investigate, to perceive the obvious, and/or to use ordinary attention to determine the truth or falsity about the terms of the CEA. Damages attributable to defendants, the second element of plaintiff's fraud claim, consequently, is lacking. Cf. Watermeier v. Mansueto, supra.; Silbernagel v. Harrell, 18 La.App. 536, 138 So. 713 (1932); Marple v. Kurzweg, 902 F.2d 397 (5th Cir. 1990).
Therefore, even though fraud need only be proved by a preponderance of the evidence and can be proved by circumstantial evidence, LSA-C.C. art. 1957, D & V's evidence is void of specific facts indicating a genuine issue of material fact on the intent of Management Committee members to gain an unfair advantage or to defraud it and on its actual or probable damages attributable to defendants. Its allegations of fraud are nothing more than conclusions reached by D & V based on its misunderstanding of the terms of the CEA which it garnered from contractors' scuttlebutt. Had D & V exercised ordinary attention, it could have discovered that the CEA did not earmark the $3 million solely for payment of its construction contract and the LWE was using the money for payment of all *701 parking facility expenses, including MOPAC rental payments, in accordance with the terms of the CEA. D & V could, therefore, have avoided any damages that it claims to have suffered. Marple v. Kurzweg, supra.
Closely scrutinizing the documents supporting defendants' motion, while treating D & V and Barriere's indulgently, indicates defendants' documents resolve all genuine issues of material fact. The summary judgment record is barren of any evidence of defendants' intent to defraud or gain an unjust advantage over D & V. The trial court, therefore, did not err by finding an absence of genuine issues of material fact as to whether defendants' actions constituted fraud.
For the foregoing reasons, the trial court's judgment is affirmed.
Affirmed.
NOTES
[1] Sidney J. Barthelemy, James M. Singleton, Anthony Mumphrey, Charles Teamer, John Alario, Frederick J. Forstall, Louis M. Freeman, Alden J. Laborde, Floyd W. Lewis, Erroll G. Williams, Dan E. Stapp, Petr L. Spurney, Lester E. Kabacoff, Norman R. Kerth, O. Keith Owen, III, Richard J. Sharp, Tom Vincent, IV and Federal Insurance Company.
[2] Exhibit A to the CEA defined the term "parking facilities" as the World's Fair Parking Lot (sometimes referred to as "MOPAC"), the Superdome parking lot and the Westbank parking lot. Specifically, the World's Fair Parking lot was to provide a minimum of 6600 automobile spaces and 300 bus spaces. The Superdome parking lot was to include 1700 spaces and a shuttle service to the fair site. The Westbank parking lot was to include a total of 1900 spaces, 1300 provided by MART and 600 provided by LWE.
[3] See Affidavits of Louis Freeman, Alden J. Laborde, Floyd Lewis, Dan Stapp, Jim Singleton, Lester Kabacoff, Charles Teamer, Petr Spurney, Frederick J. Forstall, John Alario, O. Keith Owen III, Sidney Barthelemy, Anthony Mumphrey, Norman R. Kerth, and Richard J. Sharp.

In his affidavit, Petr Spurney also attested that at "the time the management committee approved the Dutton & Vaughan contract, it was anticipated that one source of payment for that and other parking related expenses would be the $3,000,000 from the City of New Orleans."
Alden Laborde also attested in his affidavit that he did not become a member of the LWE Management Committee until February 1, 1984. Erroll Williams attested that he did not become a member of the LWE Management Committee until March 1, 1984, and he "made no representations to any representative of Dutton & Vaughan that any funds were allocated to payment of the Dutton & Vaughan contract."
[4] The record does not contain this deposition, or any deposition of H.P. Vaughan dated subsequent to his January 29, 1991 affidavit.
[5] Defendants' reply memorandum excerpts the following statements which H.P. Vaughan allegedly made in his February 6, 1991 deposition about his attendance at the December 28, 1983 Management Committee meeting:

A.... they wasn't talking to me. They never told me anything. And you are asking me who assured me of this. He didn't say, hey, Vaughan, you are going to get this money here. He didn't talk to me. They talked to each other and I just heard them say this. There was not a sole (sic) at this meeting that ever turned to me and said, look, fellow, you are going to get these three million dollars. They didn't do that. They discussed approving the contract, where the money was coming from and why they had to do this and that and then voted on it.
* * * * * *
You asked me if he personally communicated with me. He didn't personally communicate with me. I was sitting in this meeting and they talked about the contract and where the money was coming from. No one at that meeting personally turned to me, like I told you a while ago, no one ever told me, look, this three million dollars is for you. They discussed it among themselves. I doubt if any of them knew I was there. They didn't have no reason to turn to me and tell me that.
[6] The judgment also denied the motion to withdraw the answer of Tom Vincent, IV, filed by Phelps Dunbar. However, as the parties consented to the court's consideration of Mr. Vincent as one of the movants for summary judgment, the court dismissed with prejudice the claims against him.
[7] The court, however, indicated that it did not believe the money was earmarked.
[8] In Dutton & Vaughan, Inc. v. Spurney, 496 So.2d at 1128, a panel of this court held that, as a private contractor, D & V had no right of action against the Management Committee under LSA-R.S. 42:1461 for its alleged breach of fiduciary duty over its disbursement of the state/city funds.
[9] In Dutton & Vaughan, Inc. v. Spurney, 496 So.2d at 1126, a panel of this court held the petitions did not state a cause of action for negligent misrepresentation as that tort is not an exception to the general rule that corporate officers are not personally liable for the debts of the corporation.
[10] Petr L. Spurney indicated he participated in reaching "the overall understanding" with the City that it and the LWE would have a CEA, "but once that was reached [he] had nothing to do with any of the details regarding drafting legislation, allocating budgets, funds, time so forth." He further attested:

... I signed this agreement [the CEA]. I signed, for intents and purposes, all agreements, not lots, all, maybe ninety-nine point eight percent. The way this would have operated in a normal situation is that the details would have been worked out with regard to the representatives between the Fair and the City, which in this instance, normally would have been Mr. Brandt, who is vice president of planning, handled the liaison through his office with the City Council and the City, and Mr. Brandt, working with Mr. Carlson and Mr. Falgoust, who was the lawyer assigned to the construction management operation, would have coordinated this agreement without my input.
In staff meetings and in management meetings, it would have been normally discussed regarding the status of the parking and the status of the negotiations, and in the management committee, which had representatives of the City and representatives of the Council, these things would have been discussed as to the progress, and at some point, the management committee would have been asked for approval of the cooperative endeavor agreement, since it dealt with the City, and ultimately any contracts associated with this agreement, and on the basis of those votes, I would then execute the agreement.
[11] Compare Boisdore v. Bridgeman, 502 So.2d 1149 (La.App. 4th Cir.1987) [evidence clearly demonstrated attorney misrepresented and suppressed truth in his business dealings with his client with the intent to obtain an unjust advantage over him].
[12] When asked "whether or not you were ever given to any understanding that there were any restrictions on any monies received by the fair?", Spurney responded "[i]f there were restrictions on monies, they were honored, and there is no knowledge I have of any restrictions, if such exist, being violated."
[13] H.P. Vaughan is essentially D & V and, accordingly, he performed all negotiations with LWE personnel on his company's behalf. His first deposition, taken on June 10, 1987, revealed his understanding of the CEA was significantly influenced by contractors' scuttlebutt, much of which outlined the terms of the CEA before the document existed. The deposition also contained the following discussion on Vaughan's appreciation of the terms of the CEA:

Mr. Preaus: When was the first time that you heard anybody say that the money paid by the City to LWE under the cooperative endeavor agreement (sic) covered lease payments to MOPAC as well as your contract?
Mr. Vaughan: Lease payments?
Q. Did you ever hear anybody say that?
A. No. I never hear that, but theI can't see that a lease payment would be construction.
Q. Did you know that when you read the cooperative endeavor agreement (sic) when you received it in May of 1984?
A. That they was paying out of that, no.
Q. Or that it was to cover lease payments as well as construction?
Mr. Schonekas: You are asking for his understanding as far as legal opinions.
Mr. Preaus: I'm asking what he understood when he read the document.
Mr. Vaughan: I understand that the $3 million was to build the parking lot, and we was told they [the City] wouldn't enter into an agreement with LWE until they had a contractor that would build the parking lot for 3 million (sic).