580 So.2d 712 (1991)
Karlan GREENE, et ux., Plaintiffs-Appellees,
v.
GULF COAST BANK, Defendant-Appellant.
No. 89-293.
Court of Appeal of Louisiana, Third Circuit.
May 17, 1991.
*713 Cooper, Ortego & Woodruff, Silas Cooper, Jr., Scott E. Frazier, Abbeville, for plaintiff/appellee.
Sonnier, Hebert & Hebert, Paul Hebert, Abbeville, for defendant/appellant.
Mary Arceneaux, Baton Rouge, for amicus curiae.
McGlinchey, Stafford, Cellini & Lang, Stephen W. Rider, New Orleans, amicus curiae.
Before DOUCET, YELVERTON, and KING, Judges.
KING, Judge.
The issues presented by this appeal are whether or not fraud was committed by defendant against plaintiffs; whether or not the trial judge erred in his jury instructions; whether or not the trial judge properly granted defendant's exception of no cause of action with respect to plaintiffs' claim of attorney's fees; whether or not plaintiffs are entitled to interest on court costs assessed to the defendant by the trial judge; and, whether or not plaintiffs are entitled to attorney's fees for defense of this appeal.
On January 8, 1986, the plaintiffs, Karlan P. Greene and his wife, Carolyn H. Greene, filed a Petition for Declaratory Judgment against Gulf Coast Bank (hereinafter the Bank or defendant). In their petition, alleging fraud, the Greenes sought a declaration of rights and a determination that they did not owe the Bank anything on a note in the amount of $350,741.12, signed by Karlan Greene in his capacity as an officer of Industrial and Oilfield Rentals, Inc. (hereinafter I.O.R.) and personally endorsed by him, nor were they obligated under a continuing guaranty in an "unlimited" amount, signed by Karlan Greene on February 4, 1983, the same day the above-mentioned note was signed, nor were they obligated for any other indebtedness of I.O.R. arising after February 4, 1983, for which Greene assumed personal liability, allegedly because these loans grew out of *714 the initial fraud committed with regard to the February 4, 1983, transactions.
On February 3, 1986, the Bank filed a separate lawsuit against Greene for recovery of the total indebtedness of I.O.R. On February 18, 1986, this lawsuit was consolidated with the suit previously filed by the Greenes on January 8, 1986. Thereafter the Bank filed an Answer and Reconventional Demand to the Greenes' suit, reconvening against Karlan Greene in his case in the same particulars as set forth in the Bank's February 3, 1986, petition.
On November 22, 1988, the trial court, in granting a Motion in Limine filed by the Bank, ordered that the law which governs this case is the law regarding fraud as it existed as of February 4, 1983, that being La.C.C. Arts. 1847-1849 of the 1870 Code.
On November 23, 1988, the Bank filed an Exception of No Cause of Action alleging that Greene could not make a claim for attorney's fees under the 1870 Civil Code Articles. This exception was granted, and the Greenes' claim for attorney's fees was dismissed by minute entry on February 9, 1989.
Trial by jury began on November 29, 1988, and concluded on December 2, 1988, leaving only the issue of fraud before the jury.
The jury verdict form presented only two questions:
1. Did Gulf Coast Bank (its officers and employees) withhold information from Mr. Greene concerning material facts about I.O.R.'s credit history with the intent to induce him to sign the promissory note and guaranty on February 4, 1983?
The jury checked the answer YES. The other question was:
2. Could Mr. Greene by ordinary attention have detected the suppressed information?
To this question the jury answered NO.
On that verdict the trial judge signed a judgment in favor of the Greenes, rescinding all contracts by which they had become obligated to the Bank. The same judgment denied the Bank's reconventional demand, and dismissed its claims in its separate, consolidated suit. The Bank appealed.
For reasons hereinafter set forth, we affirm. A separate judgment will be handed down this date in the consolidated case of Gulf Coast Bank v. Greene, 580 So.2d 722 (La.App. 3 Cir.1991).

FACTS
The facts of this case are rather detailed; therefore, to avoid excessive repetition, we set forth the "big picture" here and leave the details until the substantive part of the opinion.
Basically, I.O.R. was a corporation created by Earl Landry in 1979. I.O.R. was an oilfield service company specializing in treating oilfield drilling site pits and performing cleanup services at drilling sites in Louisiana. Earl Landry was president and ran the corporation. From the corporation's inception Landry sought financial assistance from Gulf Coast Bank, making in the neighborhood of eighty invoice loans and thirteen equipment loans from 1979 until 1983. The invoice loans were paid, but the equipment loans were consolidated; six in February 1982, and the remaining loans in August 1982. In the two and one-half years before Karlan Greene came into the picture, I.O.R. had made only about 53% of its payments on the equipment loans, paid interest only three times, was granted extensions forty times, and had fifteen late charges. The collateral given for these equipment loans was the equipment and land.
Karlan Greene was another customer of the Bank. Oil had been discovered on Greene's land and, as a result, he had deposited about $900,000.00 in the Bank during the year preceding the February 4, 1983, transaction. Richard Dubois, President of the Bank, gave Landry several names of possible investors for I.O.R. in late 1982, one of those names being Greene. Further, Dubois introduced Landry to Greene at a Christmas party in 1982.
At the party, Greene told Landry to contact him after the New Year. Landry and Greene then met two or three times during *715 which meetings Landry and Greene reviewed financial statements, tax returns, and projections of I.O.R.
On February 4, 1983, Greene paid $40,000.00 for 49% of the stock in I.O.R., and went to the Bank with Landry where, among other things, he signed a $350,741.12 note and gave a continuing guaranty. The February 4, 1983, note was a roll over of the August 1982 consolidation of the equipment loans, plus interest, plus a life insurance premium on Greene.
Greene knowingly signed the note and continuing guaranty. He never asked about I.O.R.'s past payment history and the Bank did not inform him of I.O.R.'s poor payment history even though it is clear from the record that the Bank knew that it was exceedingly unlikely that I.O.R. would be able to repay the debt.
These are the basic facts on which the jury's verdict and the Court's judgment were based.

FRAUD
Fraud, under La.C.C. Art. 1847 of the Civil Code of 1870,[1] is a false misrepresentation or suppression of the truth bearing *716 on a material fact, made with knowledge of its falsity, with intent to deceive, with action taken in reliance upon the misrepresentation. La.C.C. Art. 1847 (1870); Mims v. Hilliard, 125 So.2d 205 (La.App. 3 Cir.1960). However, where fraud is committed by silence or inaction, there must be a "duty to speak." There is little jurisprudence on this "duty," but we find that there must be a "duty to speak" to have a fraudulent concealment.
The Supreme Court of this State recently decided Bunge Corp. v. GATX Corp., 557 So.2d 1376 (La.1990). In that case, the Court stated at page 1383:
"[I]t is only if defendant had a duty to disclose that a cause of action will lie for `in the absence of a duty to speak, silence is not fraud.' Goldfarb, `Fraud and Non-disclosure in the Vendor-Purchaser Relation,' 8 W.Res.L.Rev. 5, 11 (1956)."
Bunge was a vendor/vendee case in which the seller failed to disclose a known defect. In that context, the Court went on to state at page 1383:
"The doctrine of `caveat emptor,' used in the broad meaning of imposing risks on both parties to a transaction, has been greatly limited since its origin. The classic English case of Peek v. Gurney, L.R. 6 H.L. 377 (1873), held that there is no duty to disclose facts, however morally censurable their non-disclosure may be. That statement, based on the individualistic philosophy of freedom of contract, has grown in disfavor as courts have struggled to reach justice while maintaining the degree of certainty required by law. Thus, it is now commonly said that if either party to a contract of sale conceals or suppresses a material fact which he is in good faith bound to disclose, then his silence is fraudulent. Modern law, therefore, imposes on parties to a transaction a duty to speak whenever justice, equity, and fair dealing demand it. `This duty to speak does not result from an implied representation by silence, but exists because a refusal to speak constitutes unfair conduct.' Keeton, 15 Tex.L.Rev. at 31." (Emphasis added.)
The Court further explained at page 1384, in greater detail, when a duty to disclose exists:
"It has long been held that the duty to disclose exists where the parties stand in some confidential4 or fiduciary relation to one another, such as that of principal and agent or executor and beneficiary of an estate. Contracts, such as those of suretyship or guaranty, can also impose such a duty. More recently, courts have tended to impose a duty when the circumstances are such that the failure to disclose would violate a standard requiring conformity to what the ordinary ethical person would have disclosed. The existence of this duty is a legal question. Relevant factors include whether the obligation is being imposed on a seller, who is more likely to be required to disclose; the importance of the fact not disclosed; the relationship of the parties; and the nature of the fact not disclosed. For instance, in contracts for sale, if the vendor conceals an intrinsic defect not discoverable by reasonable care, there is a much greater likelihood of the existence of a duty to disclose the nondiscoverable and intrinsic defect than there would be to disclose something extrinsic such as a fact likely to affect market value. Prosser and Keeton, Torts, 738-39." (Emphasis added.)
4 "The confidential relationship is not restricted to any specific association of the parties. While the most frequent illustrations are those of trustee and beneficiary, attorney and client, parent and child, or husband and wife, the term also embraces partners and co-partners, principal and agent, master and servant, physician and patient, `and generally all persons who are associated by any relation of trust and confidence.' Appeal of Darlington, 147 Pa. 624, 23 A. 1046, 1047 (1892)." (Emphasis added.)
As noted above, in our present case the trial judge held that the law as it existed in 1983 applies to this case since the alleged fraud was committed on February 4, 1983. It is our opinion that the law was no different with respect to duty to speak in fraudulent concealment cases in 1983 than it is now under Bunge. The year 1983 is certainly "modern" times. Further, we find at least one case under the 1870 Code *717 which implies that a duty must be present. See Markey v. Hibernia Homestead Ass'n, 186 So. 757 (Ct. of App., Orleans, 1939). We also find in Planiol the statement that "[o]ne must even hold that simple reticence constitutes fraud when it is done fraudulently to deceive someone; but there is no `reticence' except when the law imposes on a person the obligation to speak: beyond that, silence is permitted and cannot be qualified as `reticence'...." 2 M. Planiol, Civil Law Treatise, pt. 1, no. 1061 at 608 (11th Ed. La.St.L.Inst. trans. 1959).
We recognize that the court in Bunge was considering this duty to speak not in the context of negligent misrepresentation or fraud. However, we see no reason why the same standard of duty should not exist in contract cases outside of the vendor/vendee relationship.
Further, we find that fraud by omission requires that there be a duty to disclose, and the duty to disclose exists when "failure to disclose would violate a standard requiring conformity to what the ordinary ethical person would have disclosed." Bunge Corp., supra.
The defendant argues that the trial judge erred in not instructing the jury that it must find that defendant had a duty to speak, under the circumstances of this case, in order to conclude that defendant committed fraud by concealment. The trial judge's instructions, in this case, make no mention of "duty," nor do they set out a standard of duty under which the jury could apply the facts in order to determine whether defendant had a duty to speak. When we review the trial court's instructions as a whole and find that they omit an essential element, we cannot say the instructions were adequate.[2]Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). These failings of the jury instructions require us to disregard the jury findings and make a redetermination of the facts de novo from the record and render a judgment on the merits accordingly. Rosell v. Esco, 549 So.2d 840 (La.1989).
After a review of the entire record, we find that plaintiffs have proved, by clear and convincing evidence, the following facts:

(1) The defendant suppressed and concealed the truth of I.O.R.'s past credit history with the defendant, and this suppression was made with knowledge of I.O.R.'s credit history.

As a preliminary fact, it must be noted that Gertie Blanchard, Loan Officer and Vice-president of the defendant, or Charles Patout, Chief Executive of defendant, were the loan officers on virtually all of I.O.R.'s invoice and equipment loans. They were, therefore, very familiar with the loan history of I.O.R.
There is a great deal of expert testimony interpreting the records of defendant with regard to I.O.R. This testimony is exceedingly helpful in understanding this case and we summarize it as follows:
Harry Clostio, a C.P.A. called by plaintiff, testified that I.O.R.'s tax return in 1981 showed a net income of $50,412.00 and in 1982, it showed a net income of $5,206.00. Clostio attributed this drop in net income to the payment of more interest by I.O.R. in 1982 which indicated more debt. The Bank had these tax returns in its file in February 1983, and Clostio testified that the defendant, on proper evaluation of its file, could have seen, in February *718 1983, that I.O.R. probably would not be successful.
Clostio also ran a history of I.O.R.'s loans from defendant based on information provided by the defendant. This history shows that, in February 1982, six equipment loans of I.O.R. were rolled over into a $268,486.00 loan. Patout was the loan officer. In August 1982, the remaining seven equipment loans, as well as the $268,486.00 note, were rolled over into a loan for $346,597.00. On February 4, 1983, the date in question in this suit, the note was again rolled over into a $350,741.12 note. This amount included the $346,597.00 note, plus interest, plus a life insurance premium on plaintiff. The loan officer on the August 1982, and the February 1983, loans is listed as Patout, but the record is clear that Blanchard actually handled these loans and rolled them over.
Clostio further testified that I.O.R.'s loan history indicated that, in the two and one-half years before February 1983, 156 payments were required on the equipment loans and only 83, or about 53%, were made. He stated that only interest was paid three times, that extension fees were paid forty times, that fifteen late charges were paid, and that, in his opinion, these loans, including the roll overs, were "troubled loans" by bank auditing standards.
John Wright, a C.P.A. called by the defendant, testified that, if all of I.O.R.'s loans were taken into account, both invoice and equipment loans, I.O.R.'s credit history was not bad. However, invoice loans were paid directly by I.O.R.'s customers to the defendant. There is no dispute that invoice loans were paid by this method.
We think Clostio's opinion makes more sense. The invoice loans are not relevant to the history of I.O.R.'s payment on the equipment loans, and the equipment loans are what gave rise to this litigation. Further, Wright basically stated that, if the invoice loans were excluded, Clostio's analysis of I.O.R.'s payment record was essentially correct.
Landry, who made the original loans on behalf of I.O.R., testified that defendant had been insisting on more collateral between the August 1982 roll over, when Landry's father provided some amount of collateral, and the February 4, 1983, meeting. Both Randolph Cullom, an expert in the field of banking called by plaintiff, and Wright stated that a bank does not ask for more collateral if it is satisfied with the collateral already in its possession. Landry further stated that the loan was delinquent immediately before February 4, 1983.
Gertie Blanchard, Loan Officer and Vice-president who met with plaintiff and Landry on February 4, 1983, admitted that she was familiar with all of I.O.R.'s loans, extensions, late charges, and delinquencies when she met with plaintiff and Landry. She stated that she had also reviewed I.O.R.'s file between August 1982 and February 1983. She was aware that I.O.R. had not been meeting obligations and knew that I.O.R. had missed the three payments immediately previous to February 4, 1983. Although Blanchard had access to the defendant's files and computer stored information, and, in fact, had actual knowledge of this information, she testified that she did not tell plaintiff because she was not asked. Further, Patout knew plaintiff and Landry were in the bank on February 4, 1983, and he sold plaintiff a $500,000.00 life insurance policy on that date. Blanchard testified that Patout approved some of the I.O.R. loans and was on the committee that approved large loans.
From this evidence it is clear that defendant knew that I.O.R. had a bad credit record, was unlikely to survive, and probably could not pay back the loan. Defendant also knew that the equipment and other collateral was not sufficient to cover the loan. This is also shown by the fact that the Bank could have foreclosed long before 1983, but chose not to. The defendant had this information and did not disclose it to Greene. This is, without doubt, a misrepresentation.

(2) I.O.R.'s payment history was a material fact.

Both Clostio and Cullom testified that the past payment record of I.O.R. would be material and essential to a proper *719 decision on whether or not to personally guarantee a loan. Further, Patout testified that the Bank would want to know the credit history of a customer before extending credit.
Knowledge that I.O.R. had been unable to make its payments and, in fact, missed payments immediately before February 4, 1983, was material to a decision on whether to personally endorse an already existing indebtedness and sign a continuing guaranty. This is common sense and supported by the testimony of the experts and defendant's own officers.

(3) The defendant had an intent to deceive the plaintiff.

Richard Dubois, the defendant's president, knew that I.O.R. was looking for investors. He gave Landry the name of plaintiff, as well as others, as possible investors, and he introduced plaintiff and Landry at a Christmas party in December 1982.
In January 1983, plaintiff called Patout at the Bank and, according to Greene's testimony, asked about Landry and his company. Patout testified that plaintiff only asked about Landry, but not his business. In any case, Patout's reply was that Landry was a fine young fellow, hardworking, and honest. Patout also testified that, at the time, he knew that both I.O.R. and plaintiff were customers and he knew I.O.R. was looking for investors. Further, Patout sold the life insurance policy on Greene on February 4, 1983, and announced at the Board meeting that the I.O.R. indebtedness had been endorsed by plaintiff.
Additionally, Blanchard testified that she knew of I.O.R.'s poor credit history with the Bank, but simply did not tell Greene because he did not ask.
The defendant also withheld the credit information in 1985, when it was requested by plaintiff and when plaintiff and his wife signed another note and collateral mortgage for $200,000.00. This will be discussed in greater detail later.
From this evidence and a careful review of the entire record it is abundantly clear that the defendant's officers knew of I.O. R.'s circumstances, that is, that I.O.R. was not paying the loan as agreed and that I.O.R.'s collateral was insufficient. Although in possession of this knowledge, the defendant did not tell plaintiff, knowing that it was material to his actions. It is inconceivable that defendant could have thought that the information was not important to plaintiff, and it is obvious that it was intentionally concealed supposedly because plaintiff "didn't ask."

(4) Plaintiff relied upon the representations of defendant.

Plaintiff testified that he would not have obligated himself for I.O.R.'s debts if he had known of its poor credit history. This testimony taken alone may not be sufficient to prove the point, but the record also shows that this information was very material. It is also clear that plaintiff's investment of $40,000.00 in I.O.R. was not enough to make a difference in I.O.R.'s chances of success. The Bank had the information necessary to reveal this fact in its files. Further taking into account the expert testimony in this case, it is unrealistic to believe that plaintiff would have signed documents personally obligating himself for I.O.R. if he had known all the material facts that the defendant knew.
Defendant argues that Greene could have and should have found out this information for himself. Plaintiff met with Landry two or three times before his investment and his signature on the papers at the Bank. Plaintiff testified that he knew of the debt, but that he thought it was backed-up by the mortgages the Bank had on the equipment and land. The Bank argues that plaintiff, because of his oil field experience, could have valued the equipment himself. This is true, but we do not think that Greene was under an obligation to do this. It does not excuse the Bank's fraud and, in any event, there is no way that plaintiff could have found out I.O.R.'s poor credit history with the Bank.
Defendant contends that plaintiff is an experienced businessman and he knew *720 what he was signing. We agree. Plaintiff knew what he was signing, but the fact still remains that he could not, no matter what he did, find out I.O.R.'s credit history unless the Bank told him.[3] Cullom testified that plaintiff could not have found out and that it would not have shown up on a credit bureau check. The defendant, according to the testimony of Cullom and Clostio, even managed to cover up the "troubled" loans of I.O.R. by continually restructuring them so that they did not show up as delinquent to the Bank regulators and examiners.
Additionally, it was late 1984 when I.O.R. declared bankruptcy and defendant began demanding payment from Greene. Plaintiff requested the "papers," but these papers did not show any payment record. In July 1985, plaintiff, through his attorney and at the request of Clostio, began trying to get the liability ledgers from defendant. However, it was not until May 1986 that plaintiff was able to get the credit history and this was when Dubois, the Bank's president, was required to bring the records with him to a deposition. This liability ledger produced by Dubois was incomprehensible to Clostio because it was coded in such a way that it could not be interpreted. More information was needed to completely read the ledger. Although Clostio could tell from the ledger that there had been roll overs, it was not until July 1988, when further information was finally obtained from the Bank, that Clostio could put the "scrambled up" information in his computer and finally determine what had happened with all of I.O.R.'s loans.
To use the words of plaintiff's counsel, in brief to this court, "[e]ven if Greene had been a financial wizard from Wall Street he could not have learned what he needed to know unless the Bank told him or provided him with the information he needed to learn it himself."

(5) The defendant had a duty, under the circumstances of this case, to speak.

In Bunge Corp. v. GATX Corp., supra, the Supreme Court expounded relevant factors which should be considered in deciding whether, under the facts of a particular case, a defendant has breached his duty to speak under the applicable standard set out above. The Court stated at page 1384:
"Relevant factors include whether the obligation is being imposed on a seller, who is more likely to be required to disclose; the importance of the fact not disclosed; the relationship of the parties; and the nature of the fact not disclosed."
Though a "seller" is not involved in the case at bar, basically the same factors are applicable here. I.O.R.'s past payment history was an exceedingly important fact of a material nature, not easily discoverable, especially when it was intentionally concealed. The mere fact that Greene was personally obligating himself to pay an already existing debt of a principal which defendant knew was not paying as agreed, and probably could not pay, established an adequate relationship to impose a duty to speak.[4] The ordinary ethical person would have disclosed what the defendant intentionally concealed. We do not here suggest that a bank has an obligation to find out or investigate the financial condition of a principal and "advise" a guarantor before allowing him to personally guarantee a loan; however, when a bank is obtaining an endorsement of a pre-existing debt which the bank knows the principal has not been paying, and when the bank knows that its existing collateral is insufficient, the bank *721 has a duty to reveal this information to the guarantor, endorser, or surety.
Therefore, since we find that defendant concealed a material fact with the intent to deceive plaintiff when defendant had a duty to speak, and that plaintiff relied upon the misrepresentation; the $350,741.12 note, insofar as plaintiff's liability is concerned, is void, as is the continuing guarantee signed on February 4, 1983.
Plaintiff also contends that his personal liability on other I.O.R. notes signed after February 4, 1983, culminating in a $200,000.00 note and mortgage signed by him and his wife on July 8, 1985, should also be voided because they, in effect, were signed under the continuing fraud of February 4, 1983.[5]
The note and mortgage of July 8, 1985, are void because they were given to the defendant in response to defendant's agreement not to demand immediate payment of the February 4, 1983, note. Greene had not yet discovered the defendant's fraud when he signed the papers on July 8, 1985, although he had requested information regarding the transactions of February 4, 1983, from the Bank. In effect, defendant was still concealing information, which, had plaintiff known, would have been material to his July 8, 1985, actions. For all the reasons discussed supra in relation to the February 4, 1983, actions, obligations incurred after February 4, 1983, culminating in the July 8, 1985, note and mortgage, are likewise rescinded.

ATTORNEY'S FEES
La.C.C. Art. 1958, effective January 1, 1985, states:
"The party against whom rescission is granted because of fraud is liable for damages and attorney fees."
Comment (a) of this article states, in pertinent part, that this article "[c]hanges the law in part, authorizing the award of attorney's fees ..."
Attorney's fees are not recoverable under La.C.C. Art. 1847 (1870) for fraud. See El Paso Exploration Co. v. Olinde, 527 So.2d 511 (La.App. 1 Cir.1988). The trial court held that plaintiffs were not entitled to attorney's fees because La.C.C. Art. 1847 (1870) applies to the case. However, the fraud in this case continued past January 1, 1985, as discussed, supra, in relation to the July 8, 1985, transactions. Under these circumstances, plaintiffs are entitled to attorney's fees in the amount of $61,497.11. This amount, as shown in plaintiffs' Proffer Ex. # 1 consists of expenses of $6,617.11 and hourly fees of $54,880.00. Plaintiffs are also entitled to reasonable attorney's fees for this appeal, which we will fix in the amount of $2,500.00.

COURT COSTS
In his answer to this appeal, plaintiffs also ask that interest be awarded for costs which have been advanced by plaintiffs but assessed against defendant by the trial court, and will not be paid by defendant until this Court renders its decision.
In Cotton v. Wal-Mart Stores, Inc., 552 So.2d 14 (La.App. 3 Cir.1989), we held that judicial interest is due on court costs only where the party awarded the costs has actually paid such costs. Cotton v. Wal-Mart Stores, Inc., supra, at page 20. Therefore, the party seeking to recover the court costs with interest has the burden of proving that he has actually already paid those costs. We find no evidence in the record that plaintiff has already, out-of-pocket, paid these costs; therefore, he is not entitled to interest on those costs.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to grant the plaintiffs, Karlan Greene and Carolyn Greene, attorney's fees in the amount of $61,497.11, plus attorney's fees for this appeal in the amount of $2,500.00, with interest from the date of judicial demand. In *722 all other respects, the judgment is affirmed. Costs of appeal are to be paid by defendant, Gulf Coast Bank.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] La.C.C. Art. 1847 (1870) provides:

"Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. From which definition are drawn the following rules:
1. Error is an essential part of the definition; an article [artifice] that can not deceive can have no effect in influencing the consent, and can not injure the validity of the contract.
2. The error must be on a material part of the contract, that is to say, such part as may reasonably be presumed to have influenced the party in making it; but it needs [need] not be the principal cause of the contract, as it must be in the case of simple error without artifice.
3. A false assertion as to the value of that which is the object of the contract, is not such an artifice as will invalidate the agreement, provided the object is of such a nature and is in such a situation that he, who is induced to contract by means of the assertion, might with ordinary attention have detected the falsehood; he shall then be supposed to have been influenced more by his own judgment than the assertion of the other.
4. But a false assertion of the value or cost, or quality of the object, will constitute such artifice, if the object be one that requires particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion. Sales of articles falsely asserted to be composed of precious metals, sales of merchandise by a false invoice, of any article by a false sample, of goods in packages or bales, which can not without inconvenience be unpacked or inspected, or where the party making the sale avoids the inspection with intent to deceive, of goods at sea or at a distance, are, with others of a like nature, referable to this rule.
5. It must be caused or continued by artifice, by which is meant either an assertion of what is false, or a suppression of what is true, in relation to such part of the contract as is stated in the second rule.
6. The assertion and suppression, mentioned in the last preceding rule, mean not only an affirmation or negation by words either written or spoken, but any other means calculated to produce a belief of what is false, or an ignorance or disbelief of what is true.
7. The artifice must be designed to obtain either an unjust advantage to the party for whose benefit the artifice is carried on, or a loss or inconvenience to him against whom it is practiced, although attended with advantage to no one.
8. It is not necessary that either of the effects mentioned in the last preceding rule should have actually been produced; it is sufficient to constitute the fraud, that such would be the effect of the contract, if it were actually performed.
9. If the artifice be practiced by a party to the contract, or by another with his knowledge or by his procurement, it vitiates the contract; but if the artifice be practiced by a third person, without the knowledge of the party who benefits by it, the contract is not vitiated by the fraud, although it may be void on account of error, if that error be of such a nature as to invalidate it; in this case the party injured may recover his damages against the person practicing the fraud.
10. In the words `loss or inconvenience' which may be suffered by the party, is included the preventing him from obtaining any gain or advantage, which, without the artifice, he might have obtained.
11. If the advantage to be gained by the party, in favor of whom the artifice is practiced, gives him no unjust advantage, that is to say, no advantage at the expense of the other party, and this latter would neither suffer inconvenience nor loss in consequence of the deception, if the contract were performed, the artifice does not vitiate it.
12. Combinations with respect to sales to enhance the price by false bids or offers, or to depress it by false assertions, are artifices, which invalidate the contract, when practiced by those who are parties to it, or give rise to an action for damages where they are not."
[2] The defendant also alleges that the trial court erred in giving an instruction on "caveat emptor" or "let the buyer beware" and in giving an instruction on "good faith" under La.R.S. 10:1-203.

Plaintiff contends that the jury instructions were inadequate because they failed to instruct the jury on unilateral error. We agree with all of these complaints. The doctrine of "caveat emptor" and "good faith" under La.R.S. 10:1-203 are irrelevant to the case and mislead the jury. Further, although plaintiff withdrew all of his claims except fraud, unilateral error can be fraud when one party has knowledge of the other party's error at the time of the making of the contract. La.C.C. Art. 1949, and comments; La.C.C. Arts. 1832 and 1846(6) (1870). Therefore, the instruction should have been given since it is supported by the pleadings and evidence.
These errors in the jury instructions also led to our conclusion that the jury instructions were inadequate.
[3] We recognize that Landry could have told plaintiff this information, but whatever fraud Landry might have committed and the Bank's fraud are two separate issues. Plaintiff did not sue Landry in this suit. The question before us is whether the Bank committed fraud.
[4] Defendant argues that it would have breached a duty to I.O.R. if it had disclosed its payment history. This argument is close to ridiculous. Plaintiff had just purchased 49% of I.O.R. on February 4, 1983, before going to the Bank. Further, if the Bank felt it needed I.O.R.'s permission to disclose its payment record, it should have asked for it but, under no circumstances could it allow plaintiff to bind himself personally while it intentionally withheld material information.
[5] As discussed, the law before the January 1, 1985, amendment to La.C.C. Art. 1847 and after the amendment is the same; therefore, it is immaterial which law applies to the July 8, 1985, transactions.