593 So.2d 630 (1992)
Karlan GREENE, et ux.
v.
GULF COAST BANK.
No. 91-C-1377.
Supreme Court of Louisiana.
January 17, 1992.
Rehearing Denied February 20, 1992.
Paul J. Hebert, Charles R. Sonnier, Fred W. Davis, Sonnier, Hebert & Hebert, Charles William Roberts, Michael R. Mangham, Louis R. Davis, George W. Hardy, III, Mangham, Hardy & Rolfs, for applicant.
Silas B. Cooper, Jr., Cooper, Ortego & Woodruff, for respondent.
Bennet Scott Koren, Stephen Winthrop Rider, Byron Franklin Martin, III, for amicus curiae, First Nat. Bankers Bank.
MARCUS, Justice.
Industrial and Oilfield Rentals, Inc. (I.O.R.), incorporated in 1979, was an oilfield service company specializing in treating site pits and cleaning up drilling sites. Between 1979 and 1983, the president and founder of I.O.R., Earl Landry, borrowed money from Gulf Coast Bank (Bank) on numerous occasions. Most of these loans were invoice loans[1] or equipment loans. The equipment loans were secured by collateral chattel mortgages on I.O.R. equipment and a collateral mortgage on Landry's immovable property. In February 1982, Landry consolidated six outstanding equipment loans into a $268,000.00 note. This loan and subsequent equipment loans were consolidated in August 1982 into a $346,597.00 note. At this time, Landry's father mortgaged some of his property as *631 additional collateral for the loan.[2] As of February 4, 1983, I.O.R. had made fifty-three per cent of the payments on the consolidated equipment loan and paid forty extension fees, fifteen late charges, and seven delinquencies. The total assets, including equipment, of I.O.R. were about $600,000.00.
Karlan Greene, a native of the area, had been employed in oil-related businesses since his return to Louisiana in 1977. Some of his work as an engineer involved appraising oilfield equipment. During this time, he was also involved in various other businesses, such as real estate development. He became a substantial depositor at the Bank after oil was discovered on his property in 1982. Richard Dubois, an officer at the Bank, introduced Greene to Landry at a Christmas party in 1982. Greene's name was also on a list Dubois gave Landry of four men who would possibly be interested in investing in I.O.R. Landry subsequently contacted Greene in early 1983 about investing in I.O.R. In the course of negotiations, in which the Bank played no role, Landry presented Greene with materials reflecting the financial status of I.O.R. Included in these materials were tax returns, financial statements, business projections, and a list of equipment and its value. Greene was informed of the debt owed to the Bank and the equipment that was collateral for the debt, but did not inspect the equipment at this time.
On February 3, 1983, Greene paid $40,000.00 for 49% of the I.O.R. stock and was elected a director and vice-president. The next day (February 4), Greene and Landry went to the Bank to restructure the equipment loan in order to reduce the monthly payments and extend the loan. The Bank agreed to reduce the monthly payments from approximately $9,000.00 to $5985.13 and extend the loan to ten years. Both Landry and Greene signed the face of the new $350,741.12 demand note[3] as makers in their corporate capacity and personally endorsed the reverse side of the note. In addition, Greene signed a continuing guaranty for any loans made or to be made to I.O.R. by the Bank. After his initial investment, Greene continued to contribute funds to I.O.R., becoming a 51% shareholder in 1984. He loaned office space to I.O.R. and provided automobiles and secretarial assistance. The Bank continued to loan money to I.O.R. Despite this infusion of added capital and additional loans, I.O.R. fell victim to the decline of the oil industry in 1984 and filed for bankruptcy. Landry also filed personal bankruptcy proceedings.
In May 1985, the Bank informed Greene that the I.O.R. equipment loan was delinquent and as an endorser, co-maker, and guarantor, he would be responsible for the $403,945.49 debt. The Bank gave Greene the option of paying the amount monthly through an escrow account or providing the Bank with a $200,000.00 second mortgage on property he had previously mortgaged to the Bank. Greene chose the latter option and he and his wife executed a mortgage on July 8, 1985.
Subsequently, Greene and his wife filed a petition for declaratory judgment, naming the Bank as defendant and seeking a declaration of their rights under the continuing guaranty and related documents. The petition alleged that the Bank knowingly withheld information about the I.O.R. loan repayment history and sufficiency of collateral in order to induce Greene to sign the continuing guaranty and related documents. The petition also alleged duress and negligent misrepresentation by the Bank. The Greenes prayed for a judgment rescinding the February 4, 1983 continuing guaranty and all resulting contracts and obligations. In the alternative, they sought damages equal to the debt owed to the Bank. The Bank filed an answer and *632 reconventional demand seeking enforcement of the Greenes' obligations to the Bank. In a separate suit, the Bank sued Greene on the I.O.R. promissory notes and sought recognition of the collateral mortgages pledged for the indebtedness. The two suits were consolidated for trial.[4] After a jury trial, a verdict was returned finding that the Bank had knowingly withheld information from Greene concerning material facts about I.O.R.'s credit history with the intent to induce him to sign the February 1983 promissory note and guaranty. The jury also found that Greene could not have detected the suppressed information by ordinary attention.[5] The trial judge entered a judgment in favor of the Greenes, rescinding the February 4, 1983 continuing guaranty and all related contracts obligating them to the Bank. The judge also dismissed the Bank's reconventional demand and its other claims against the Greenes. The Bank appealed.
The court of appeal amended the judgment of the district court to include attorney fees, but otherwise affirmed.[6] The court found that the trial judge erred in failing to instruct the jury that there must be a duty to speak in order to find fraud through silence. The court then redetermined the facts de novo from the record and found that the Greenes proved the Bank's fraud by clear and convincing evidence. The court stated that ordinarily a bank does not have a duty to investigate a principal's financial condition and advise a guarantor, but it does have a duty to speak when a guarantor is endorsing a pre-existing debt and the bank knows the principal has not been paying and the collateral is not sufficient. After determining that the Bank owed a duty to disclose, the court found that the Greenes proved the remaining elements of fraud under La.Civ.Code art. 1847 (1870).[7] On the Bank's application, we granted certiorari to review the correctness of that decision.[8]
The issue in this case is whether the Bank owed a duty to disclose I.O.R.'s financial condition to Greene, a major stockholder and officer of I.O.R., before he personally endorsed the note and signed the continuing guaranty on February 4, 1983.
According to La.Civ.Code art. 1847 (1870), fraud, as applied to contracts, is the cause of an error concerning a material part of the contract, created or continued by artifice and with intent to obtain an unjust advantage or cause a detriment or loss to the other party. To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information. Markey v. Hibernia Homestead Ass'n, 186 So. 757, 764 (La.App. Orl.Cir.1939). Ordinarily, a bank and depositor have a debtor-creditor relationship with no independent duty of care imposed on the bank. However, certain special circumstances, such as a fiduciary relationship between the bank and depositor, will give rise to a duty. See Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish, 583 So.2d 443, 452 (La.1991). For example, in Trans-Global, this court found that, due to its role as pledgee, a bank had a fiduciary obligation to protect a customer's collateral.
In the present case, Greene has not shown that the Bank owed him a duty to disclose information about I.O.R.'s credit history. There was no special relationship between the parties that would give rise to a duty to disclose. Greene did not go to the Bank on February 4, 1983 as an inexperienced *633 or unsophisticated investor who had to rely on the Bank to advise him of the risks of his investment. He has two undergraduate degrees and a masters degree in engineering physics. An engineer in the oilfield business since 1977, Greene has appraised oilfield equipment. In fact, prior to this controversy, he had appraised some oilfield equipment for the Bank. Furthermore, Greene was not unfamiliar with corporations and financing. He had been involved in setting up small corporations and had executed a chattel mortgage with a different bank on behalf of one of those corporations. Greene acknowledged that he was aware of the large I.O.R. debt before he made his investment. At trial he testified:
The debts, I think, they were carrying a pretty heavy debt, a single debt, with Gulf Coast Bank. I think it was about three hundred thirty thousand dollars ($330,000.00) at the time. I asked him [Landry] about it and he said, "Well, it's well collateralized" and he said, "We got all this equipment backing it up and then we got my father's land, Burnside Plantation and my land and whatever." So, I just kind of put that out of my mind.
Greene also contends that the February 4, 1983 loan was undercollateralized. But he also admits that he did not inspect the equipment before investing. Rather than using his own expertise to evaluate the collateral for the debt, he relied on the value stated in the mortgages. When Greene went to the Bank with Landry on February 4, 1983, he went as a major stockholder and officer of I.O.R. and signed the note in this capacity. He and Landry also endorsed the note, in accordance with general banking policy that requires major corporate shareholders personally to endorse corporate obligations. Greene then signed a continuing guaranty, which was an additional means of securing his personal liability for I.O.R. loans. Furthermore, there is no evidence that the Bank had any superior knowledge about I.O.R.'s financial condition that it failed to disclose to Greene. Even though the loan payments were delinquent, information I.O.R. provided to the Bank showed that the company was making a profit. Greene contends that I.O.R.'s 1982 tax return, which showed a net loss, should have indicated to the Bank that the company was in trouble and would not be able to repay its debt. The 1982 tax return, however, was not prepared until after April 30, 1983, more than two months after Greene signed the continuing guaranty. The 1981 tax return (for the year ending April 30, 1982) showed a decline in profits from the previous year, but an increase in gross income. In addition, the Bank could see that the invoice loans were being paid in full, an indication that I.O.R. customers were satisfied. After Greene's initial investment in February 1983, he continued to invest money in the business and eventually became the majority stockholder. As such, he had access to I.O.R. files and ample opportunity to investigate I.O.R.'s financial status.
In sum, there are no special circumstances in this case that would impose a duty on the Bank to disclose I.O.R.'s financial condition to Greene. The Bank did not participate in the negotiations between Landry and Greene. During negotiations, Greene reviewed the financial statements of I.O.R. and was apprised of the heavy debt and the collateral for that debt. Nevertheless, Greene chose to invest in I.O.R. without further independent investigation. When Greene later went to the Bank and obligated himself on the note and continuing guaranty, he was in a position to know as much or more than the Bank about the financial condition of the company of which he was a major stockholder and officer. The subsequent default on the loan and the insufficiency of the underlying collateral were more likely than not due to the decline in the oil industry. Since we find that the Bank had no duty to disclose, it is not necessary to determine whether the other elements of fraud have been met under La.Civ.Code art. 1847 (1870).[9] The *634 court of appeal erred in finding that the Bank owed a duty to disclose under the circumstances here presented. We must reverse.
Although the parties stipulated that as of November 28, 1988 the total indebtedness was $624,855.48, we consider it more appropriate to remand the case to the district court to enter a judgment in favor of the Bank and against the Greenes for the stipulated amount plus the additional interest due from that date and for a proper recognition of the mortgages.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed. The case is remanded to the district court for further proceedings in accordance with the views expressed herein. All costs are assessed against Karlan and Carolyn Greene.
NOTES
[1] Invoice loans, or accounts receivable loans, involve a company pledging to a bank its invoice to a customer. The bank loans the company a percentage of the invoice amount (in this case 80%) and notifies the customer to pay the bank directly. When the bank receives the payment, it deducts the amount of the loan plus interest and deposits the remainder in the borrower's account. In the present case, the invoice loans were all fully repaid and are not at issue.
[2] The Bank officer in charge of I.O.R.'s loans testified at trial that the Bank asked for additional collateral because Landry's brother, then a principal in I.O.R., was withdrawing from the corporation and requesting a return of his collateral.
[3] In addition to what was owed under the previous loan, the total included a premium for a life insurance policy on Greene, which was to be assigned to the Bank as collateral for the debt. Landry had previously been required to assign a similar policy to the Bank.
[4] Before trial, the parties stipulated that, as of November 28, 1988, the total indebtedness was $624,855.48.
[5] The Greenes dismissed the claims of negligent misrepresentation and duress during the trial. Therefore, fraud was the only issue before the jury.
[6] Greene v. Gulf Coast Bank, 580 So.2d 712 (La.App. 3d Cir.1991). The court of appeal rendered a separate judgment in the suit by the Bank against the Greenes, for the reasons assigned in the companion case of Greene v. Gulf Coast Bank. Gulf Coast Bank v. Greene, 580 So.2d 722 (La.App. 3d Cir.1991).
[7] Prior to trial, the trial judge ordered that La. Civ.Code arts. 1847-1849 (1870) were applicable to this case. The current code provisions on fraud, arts. 1953-1958, did not go into effect until January 1, 1985.
[8] 585 So.2d 554 (La.1991).
[9] Nothing in the record supports a rescission of the guaranty and notes because of fraud by a third party. La.Civ.Code art. 1847(9) (1870) states:

If the artifice be practiced by a party to the contract, or by another with his knowledge or by his procurement, it vitiates the contract; but if the artifice be practiced by a third person, without the knowledge of the party who benefits by it, the contract is not vitiated by the fraud, although it may be void on account of error, if that error be of such a nature as to invalidate it; in this case the party injured may recover his damages against the person practicing the fraud.
There is no evidence in the record indicating that the Bank knew or should have known of any fraud by Landry. Greene did not sue Landry, nor does he allege any fraud by Landry in this action.