274 So.2d 173 (1973)
MIDDLE TENNESSEE COUNCIL, INC., BOY SCOUTS OF AMERICA et al.
v.
Ralph M. FORD et al.
No. 52230.
Supreme Court of Louisiana.
February 19, 1973.
Rehearing Denied March 26, 1973.
*174 Jones, Kimball, Patin, Harper, Tete & Wetherill, G. Allan Kimball, William M. Nolen, Lake Charles, for plaintiffs-applicants.
Dale, Owen, Richardson, Taylor & Mathews, Robert C. Taylor, Breazeale, Sachse & Wilson, Victor A. Sachse, Paul M. Hebert, Jr., Baton Rouge, for defendants-respondents.
SUMMERS, Justice.
Leslie G. Boxwell executed his last will and testament in Nashville, Tennessee, on September 10, 1954. A series of codicils were later added, the last on February 16, 1957. Several special bequests were contained in the will. Nashville Council Boy Scouts of America, Trustees of the Nashville Boy Scout Foundation, and the University of the South at Sewanee, Tennessee, were made residuary legatees. John J. Hooker was named executor of the will.
Boxwell died on September 24, 1960 in Nashville, Davidson County, Tennessee, leaving no descendants, ascendants or collateral relations. His will was probated on September 29, 1960 and letters testamentary issued to Hooker as executor.
At the time of his death Boxwell owned an undivided one-third interest in a tract of land situated in East Baton Rouge Parish, which the deed description represented to be 129 acres. A survey in March 1962 showed it to contain 137.22 acres known as portions of Richland Plantation in Section 94, Township 7 South, range 1 East, in the Greensburg District of Louisiana.
In ancillary proceedings conducted in East Baton Rouge Parish, on the petition of Hooker the executor, Boxwell's last will and testament was admitted to probate on November 6, 1961. A sworn descriptive list filed in those proceedings appraised the fair market value of Boxwell's one-third interest in the land at $35,000. Hooker was confirmed as a testamentary executor of Boxwell's succession in Louisiana.
On November 17, 1961 the executor petitioned to sell the undivided one-third interest of the succession realty at private sale to the co-owners Ralph M. Ford and Rosalie Segari Thomas for $35,000. The petition alleged the sale was necessary "to pay legacies therein provided." The application was duly advertised. No opposition having been filed, the sale was authorized by the judge on March 8, 1962. Following this, the deed was executed on March 22, 1962, conveying the undivided one-third interest of decedent in the property to Ralph M. Ford and Rosalie Segari Thomas for *175 $35,000. Estate and inheritance taxes were paid, and the final tableau of distribution was published and homologated.
The executor then petitioned the trial court alleging that the residuary legatees were domiciled outside the State and an attorney at law should be appointed to represent them and upon whom service of the executor's final account could be made. An attorney was accordingly appointed to represent the residuary legatees upon whom the final account was served. He promptly notified the residuary legatees in Nashville, Tennessee. No opposition having been timely filed, the final account was approved and homologated August 15, 1962.
Almost four years later, on March 7, 1966, Middle Tennessee Council, Inc., Boy Scouts of America, successors to Nashville Council Boy Scouts of America; the Trustees of the Middle Tennessee Council Foundation and Trust Fund, successor to Trustees of Nashville Boy Scout Foundation; and the University of the South, joined as plaintiffs and brought this suit in East Baton Rouge Parish against Ralph M. Ford, Barbara Marie Hornbeak, the sole surviving heir of Rosalie Segari Thomas who had died in the meantime, and John J. Hooker. The suit sought to have the sale decreed to be an absolute nullity and the price returned to the purchasers. Alternatively, it was alleged that the market value of the property as of the date of the sale was $232,200, and the conveyance should be annulled for lesion beyond one-fourth, as an attempted partition; or that the conveyance be annulled as a sale subject to nullity for lesion beyond moiety, or that the purchasers pay $197,200 to the succession.
As grounds for the relief prayed for petitioners assert:
(1) They had no notice of the sale and no curator or attorney was appointed to represent them until after the sale was concluded.
(2) At the time of the sale on March 22, 1962, the executor had sufficient funds to discharge all cash legacies and obligation of the succession, and therefore, since the sale was not necessary, the executor exceeded his authority.
(3) The market value of decedent's one-third interest at the time of the sale was $232,200, or more, which fact was known to the purchasers and the executor. The sale was, therefore, made for a woefully inadequate consideration and was absolutely null.
Declinatory exceptions of improper citation, jurisdiction rationae personae and improper joinder were filed by the executor. All defendants joined in a motion for summary judgment, and defendants Ford and Hornbeak jointly filed an exception of no cause of action and a plea of prescription of two years. The trial judge sustained the declinatory and dilatory exceptions filed by the executor, and sustained the exception of no cause of action filed by the defendants Ford and Hornbeak. The motion for summary judgment was granted.
On appeal to the First Circuit the judgment a quo was reversed, and the case was remanded for trial on the merits. 205 So.2d 867. After trial judgment was rendered rejecting plaintiffs' demands as to all defendants, Hooker having died since the trial of the case, Harlan Dodson was substituted in his place as alternative testamentary executor. The case was again appealed to the First Circuit where the judgment of the trial court was affirmed. 256 So.2d 658. We granted certiorari on plaintiff's application. 260 La. 1195, 258 So.2d 549.
The residuary legatees contend that the proceedings authorizing the sale, and the sale itself, should be set aside for they had no notice thereof, and no curator or attorney was appointed to represent them until after the sale was concluded.
Article 3171 of the Code of Civil Procedure is pertinent to this contention:
If it appears from the record, or is otherwise proved by an interested party, *176 that an heir of an intestate, or a legatee or presumptive legal heir of a deceased testator, is an absentee, and there is a necessity for such appointment, the court shall appoint an attorney at law to represent the absent heir or legatee.
From the proceedings it was obvious that the principal, and residuary, legatees of this succession were absentees. And, in a case like this, where the entirety of the succession property in Louisiana was being sold at private sale, "a necessity for the appointment" existed. The necessity is inherent in the circumstances presented by this case. Under the doctrine of le mort saisit le vif, valuable property rights already vested in the residuary legatees were involved. La.Civil Code arts. 940-42; Succession of Coco, 185 La. 901, 171 So. 70 (1936). These residuary legatees who were to be the sole beneficiaries of the sale proceeds required notice of, and an opportunity to oppose, such a sale, if, in their judgment, the facts and the law warranted such action. Succession of McLaughlin, 14 La.Ann. 398 (1859); Johnson v. Davidson, 6 Mart., O.S. 506 (La.1819); Succession of Bowles, 3 Rob. 35 (1842); cf. Succession of Senkpiel, 227 La. 516, 79 So.2d 866 (1955).
Although the designation of an attorney for absent heirs is not an arbitrary requirement of law, but one that is dependent upon the circumstances of each case, the appointment becomes essential in a case where the necessity is shown during a pending administration of a succession. Succession of Kellogg, 51 La.Ann. 1304, 26 So. 262 (1899).
Notwithstanding the failure to appoint an attorney for the absent legatees, it has often been held that the appointment of an attorney is merely directory, and the failure to appoint one is, at most, only a relative nullity. Succession of Kellogg, supra; Succession of Price, 197 La. 579, 2 So.2d 29 (1941); Heirs of Herriman v. Janney, 31 La.Ann. 276 (1879); Succession of Wadsworth, 2 La.Ann. 966 (1847) and Gibson v. Foster, 2 La.Ann. 503 (1847).
As a relative nullity, the informality resulting from the failure to appoint an attorney for the absent legatees is prescribed against after the lapse of two years by the prescription of Article 3543 of the Civil Code. It reads:
All informalities of legal procedure connected with or growing out of any sale at public auction or at private sale of real or personal property made by any sheriff of the Parishes of this State, licensed auctioneer, or other person authorized by an order of the courts of this State, to sell at public auction or at private sale, shall be prescribed against by those claiming under such sale after the lapse of two years from the time of making said sale ....
Recognizing the applicability of this article to the facts of this case, plaintiffs contend defendants cannot avail themselves of its provisions to cure the informality arising from the failure to appoint an attorney to represent the absent legatees, for defendants were in legal bad faith. In re Union Central Life Insurance Co., 208 La. 253, 23 So.2d 63 (1945); Bordelon v. Bordelon, 180 So.2d 855 (La.App.1965).
Plaintiffs assert this bad faith consists of defendants' (1) failure to give plaintiffs notice of the sale until after it was made; (2) failure to ascertain whether or not a more advantageous sale could be made; (3) consummating the sale without testamentary or legal authority to do so; and (4) sale of the property for a woefully inadequate price.
By the terms of the will the testator directed that the executor have power to sell such portion of his estate "as may be necessary in the judgment of the executor to effect the distribution herein provided for, and I give full power to the executor to make such sales upon such terms and conditions as he deems best." All of the bequests to the residuary legatees were *177 made of a proportion of the "value" of the property left by the decedent. And the bequest to the Nashville Council Boy Scouts of America was made for the purpose of "improving or maintaining a camp site for Boy Scouts in or near Nashville, Tennessee."
These conditions in the will, the executor asserts, gave him a wide discretion and authority to sell the property in order to reduce the real estate to its "value" in money as the will directed. It was also necessary to sell the decedent's one-third interest in order to permit the value distribution among the residuary legatees called for by the will. Moreover, since the proportion of decedent's estate bequeathed to the Nashville Council Boy Scouts of America was to be used for "improving or maintaining a camp site for Boy Scouts in or near Nashville, Tennessee," only the liquidity of money was suitable to accomplish this purpose.
The testamentary conditions made sale of the Louisiana real estate necessary. Furthermore the sale was sanctioned by Article 3261 which permits a succession representative to "sell succession property in order to pay debts and legacies, or for any other purpose, when authorized by the court ...." Court approval of the action fortifies the executor's position. From the language of the will it is evident the testator did not intend that these residuary legatees should receive an undivided interest in the land. Instead it was the testator's intention that the executor reduce the property to cash and divide the "value" among the residuary legatees. The purpose of the sale was therefore authorized by the testament, by Article 3261 and by the court. Succession of Pipitone, 204 La. 391, 15 So.2d 801 (1943).
Ultimately, the central issue is whether the irregularity of not appointing an attorney for the absent heirs resulted, under the circumstances, in depriving the residuary legatees of a fair price for the land. A finding that the price was woefully inadequate would result in a vice of substance rendering the sale an absolute nullity against which the prescription of Article 3543 cannot run. Thibodeaux v. Thibodeaux, 112 La. 906, 36 So. 800 (1904). See also La.Civil Code Article 2619; Phoenix Building and Homestead Assn. v. Meraux, 189 La. 819, 180 So. 648 (1938).
To put it another way, plaintiffs contend that the gross inadequacy of the price created a "defect of substance", which either solely or together with the bad faith actions of the executor make the sale an absolute nullity.
Value is a question of fact determined adversely to plaintiffs in both the trial and appellate courts. For these reasons this Court should be reluctant to overturn this finding.
The weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. However, the sincerity and honesty of the opinions expressed are matters which the trial judge is in a particularly advantageous position to determine. It is, in effect, in part, a question of credibility, and when the experts are widely disparate in their conclusions, the rule has special relevance.
The property was situated just outside the southeast limits of the city of Baton Rouge as established in March 1962. It consisted of 137.22 acres of gently rolling pasture land with scattered hardwood trees. The extreme northeastern 7.22 acres were separated from the main tract by Perkins Road and a parallel railroad and railroad right-of-way running in a northwest-southeast direction. A creek occupying 2.5 acres bisected the 7.22 acres. No improvements enhanced the property other than two silos and a five-strand barbed wire fence enclosing each tract. The land was in a residential area, suitable for subdivision development.
Three important factors must bear heavily upon any appraisal of this property. *178 First, testimony concerning values was taken in 1970, eight years after the conveyance in March 1962. Since values are to a large extent affected by illusive nuances, trends, economic conditions, and like factors, this effort to reconstruct values in retrospect must of necessity affect both the accuracy and reliability of the conclusions. Secondly, the property in question involved an undivided one-third interest, which, with the legal and practical implications associated with such ownership, must of necessity have had a detrimental effect upon value. One expert estimated the detrimental effect would reduce the tract's value by 35 percent. Finally, as one expert stated, the most significant factor in the entire study relating to market sales was a serious drop of approximately 50 percent in construction of single family dwellings during the year 1960 and a further drop of an additional five percent during the year 1961 just prior to the conveyance in March 1962. In addition to the lowered housing starts, V.A. foreclosures during the year 1960 more than doubled the 1959 foreclosures. This trend rose sharply until 1963 at which time a gradual decline occurred. These conditions had this significance: Although the peak year of foreclosures was 1963, all of the homes being foreclosed against were on the market during 1961 and 1962 with no apparent purchasers available. The witness concluded that "prospective, fully informed developers would have been wary of entering the residential housing market and would certainly not have been interested in purchasing an undivided one-third (1/3) interest in a residential development tract."
This witness, Kermit A. Williams, appraised the total value of the undivided one-third interest at $35,432. His experience and qualifications are impressive. Six comparables used by him in his market data approach compared most favorably with subject tract after adjustments for location, size, terrain, time, market demand and the undivided interest factor.
Before petitioning the Court for authority to sell the property, Hooker came to Baton Rouge and spoke to H. H. Manner, a partner and very close friend of the deceased Boxwell. Manner had previously informed Hooker that Ford was interested in buying Boxwell's interest in the property. Manner recommended Parker Meade as a competent real estate man to give Hooker an opinion of the property's value. After considering the trends and consulting other real estate men and investors, Meade fixed the value of the property at $35,000. Later this value was approved for estate and inheritance tax purposes and used in the sworn descriptive list. At the time Hooker also consulted with another real estate expert concerning the property value.
Heidel Brown, another expert appraiser, considered location to be the single most important attribute of real estate value. He found 20 percent of the property to be waste, subject to innundation and requiring special treatment to make it usable. He established by comparison that the effect of an undivided interest was to reduce the property value 35 percent. Size of the tract was also a factor which contributed to the limited marketability. Brown recommended against the purchase of the undivided interest for $35,000, feeling that the money could be better invested elsewhere. His appraisal was $850 per acre for the property in question.
Mack H. Hornbeak is the husband of Barbara Thomas, daughter of the deceased Rosalie Segari Thomas. Barbara Thomas Hornbeak and Ralph M. Ford, purchased the controverted property as authorized in the ancillary proceedings. Hornbeak confirmed that the property was not worth $35,000 in 1962 because the investment would involve a long-term pay out. He reluctantly consented to the purchase by his wife.
O. M. Pollard had been engaged in developing subdivisions for 25 years. Among others, he developed Pollard Estate Subdivision *179 adjoining subject property on the southwest. He acquired the property in 1954 for $110,000. He recounted the difficulty he experienced in developing this property and testified that he would not have purchased the entire property involving the Boxwell one-third interest in 1962 for $105,000 because "sales of lots was terrifically bad at that time."
Verdie Reece Perkins had been in the real estate business since 1936. He was a director of the City National Bank for 20 years. His experience involved development of a number of residential subdivisions. In his study of the property he used the market data approach and arrived at a value of $800 per acre.
All of the foregoing appraisers were of mature years and extensive experience. Their testimony is entitled to great weight.
On the other hand, plaintiff's appraiser, John LeJeune, age 43, placed a value of $5,000 per acre on the property. While Karl J. Snyder, who had been an appraiser for fifteen years, placed a value of $682,000 on the whole property as of April 1962. Alvin K. Seago, an appraiser with impressive qualifications placed a value of $555,880 on the entire tract.
Clearly, it is impossible to reconcile these widely divergent conclusions. There is no compelling basis in the reports of plaintiffs' experts to reject the reports of defendant's experts or their conclusions. As observed at the outset of this discussion of values, the evidence does not warrant overturning the finding of the trial and appellate courts on this issue. Defendants have by a preponderance of the evidence established that $35,000 was a fair price for the one-third interest conveyed by the court approved sale of March 1962.
Since we have arrived at the conclusion that the price was fair and represented the actual value of the interest conveyed in subject property, there can be no defect of substance to serve as a basis for nullity of the sale; nor can there be any issue of lesion beyond one-fourth as in partitions or lesion beyond moiety as in sales. Plaintiffs' claim of nullity for defect of substance and the alternative demands based on claims of lesion are therefore without substance.
For the reasons assigned, plaintiffs' suit is dismissed at their costs.