969 So.2d 733 (2007)
Ruth Covington JOHNSON, Plaintiff-Appellant
v.
The UNOPENED SUCCESSION OF ALFRED COVINGTON, JR., et al., Defendants-Appellees.
Columbus Covington, et al, Plaintiffs-Appellants
v.
The Unopened Succession of Alfred Covington, Jr., et al, Defendants-Appellees.
Nos. 42,488-CA, 42,489-CA.
Court of Appeal of Louisiana, Second Circuit.
October 31, 2007.
*736 Charles E. Herring, Jr., for Appellant.
Daniel J. Ellender, Monroe, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
WILLIAMS, J.
Plaintiffs, Ruth Covington Johnson, Columbus Covington, Melvyn Covington and Roosevelt Covington, seek reversal of the district court's ruling granting exceptions of prescription in favor of defendants, The Unopened Succession of Alfred Covington, Jr., The Unopened Succession of Rose Edwards Covington and the Alfred Covington, Jr. Revocable Trust. For the reasons that follow, we affirm the district court's ruling.

FACTS
Alfred Covington, Sr. ("Alfred, Sr.") died testate in Morehouse Parish on December 4, 1984. During his life, he married twice: first to Arpolian Dorsey Covington ("Arpolian"), then to Josephine Covington ("Josephine"). Eleven children were born during Alfred, Sr.'s marriage to Arpolian. During their marriage, Alfred, Sr. and Arpolian acquired a substantial amount of land in and around Oak Ridge, Louisiana. They were divorced in 1947. When the community property was partitioned, they each received approximately 120 acres of land and Arpolian received the family home. Alfred, Sr. later married Josephine, and five children were born during the marriage.
In Alfred, Sr.'s last will and testament, dated January 23, 1983, he bequeathed all of his property to his "legitimate children, natural children and grandchildren" in equal shares. The will appointed Travis Holley as executor of the estate and as the attorney to probate the will. Holley petitioned the court to sell the 120 acres for $40,000. The descriptive list estimated the value of the property to be $120,000.
After complying with the advertising requirements and receiving no opposition, the court entered a judgment of homologation on June 26, 1986 authorizing the sale of the land for $40,000. On July 3, 1986, Holley conveyed the property by cash deed to Alfred Covington, Jr. ("Alfred, Jr.") for $40,000. On August 10, 1987, Holley filed a final accounting, reflecting that $12,618.84 in cash was available for distribution after the payment of all succession debts. The 20 legatees received approximately $600 each. Alfred, Jr., a resident of California, maintained ownership of the property until May 8, 2003, when he conveyed the property by cash deed to the Alfred Covington, Jr. Revocable Trust ("the Trust").
Arpolian died testate on March 9, 1986, owning approximately 40 acres of land and *737 a home in rural Morehouse Parish.[1] In her last will and testament, Arpolian bequeathed her property to her eight living children at the time and her grandchildren from a predeceased child, subject to the usufruct of her daughter, Ruth Covington Johnson ("Ruth").[2] Two of Arpolian's sons, Alfred, Jr. and Roosevelt Covington ("Roosevelt") were named co-executors of the estate, and Jack Files was named the attorney for the estate.
On September 5, 1987, Files petitioned the court to sell the property (the home and the land) to Alfred, Jr. for $25,000. After the advertising requirements had been met and no opposition was filed, the court entered an order authorizing the sale on November 5, 1987. On September 16, 1988, the property was conveyed to Alfred, Jr. by cash deed. On November 2, 1988, Files filed a tableau of distribution reflecting that all proceeds from the sale would be applied to the debts, that any outstanding debts would be waived and there would be no cash remaining for distribution. In 2003, Alfred, Jr. conveyed the property to the Trust.
On September 9, 1988, approximately one week before the sale of the property to Alfred, Jr., Alfred, Jr. and Ruth signed a document styled "Declaration by Parties to Option to Purchase," indicating a desire to grant Ruth an option to purchase the property from Alfred, Jr. for $25,000. The document also stated that the option would be executed immediately following Alfred, Jr.'s purchase of the property from the estate. The option was never executed and Ruth never attempted to exercise the option.
Alfred, Jr. died in California on April 5, 2005. His son, Donald Covington ("Donald"), was the succession representative for both his father's estate and that of his mother, Rose Edwards Covington ("Rose"), who predeceased Alfred, Jr. Donald was also the trustee of the Trust. After Alfred, Jr.'s death, Donald, on behalf of the Trust, continued to pay taxes, collect rental proceeds and maintain insurance on the properties.
On September 13, 2005, Ruth filed a petition against the unopened successions of Alfred, Jr. and Rose and the Trust, requesting rescission of the sale of the property from Arpolian's estate to Alfred Jr. Ruth also joined with her brothers, Columbus, Melvyn and Roosevelt Covington in a suit to rescind the sale of the 120 acre tract sold to Alfred, Jr. from Alfred, Sr.'s estate.
In response, defendants filed peremptory exceptions of prescription and alternative exceptions of nonjoinder of indispensable parties in both suits, as well as answers and reconventional demands in the event the exceptions were not granted. The cases were consolidated by joint motion.
At the hearing on the exceptions of prescription, the district court heard arguments of counsel but refused to receive testimony. After reviewing the pleadings and exhibits and hearing arguments, the court granted the exception of prescription and declined to rule on the exception of failure to join an indispensable party.[3]

*738 DISCUSSION
A party urging an exception of prescription has the burden of proving facts to support the exception unless the petition is prescribed on its face. Cichirillo v. Avondale Indus., Inc., 2004-2894 (La.11/29/05), 917 So.2d 424; Winford v. Conerly Corp., XXXX-XXXX (La.3/11/05), 897 So.2d 560. Although evidence may be introduced to support or controvert any objection pleaded, in the absence of evidence, an objection of prescription must be decided upon facts alleged in the petition with all allegations accepted as true. LSA-C.C.P. art. 931; Cichirillo, supra.
Evidentiary Ruling
First, plaintiffs contend the district court committed reversible error in refusing to allow them to introduce testimony to controvert the exceptions of prescription. According to plaintiffs, the testimony was relevant to prove when they obtained knowledge of Alfred, Jr.'s alleged fraud and ill practices. During the hearing, the following exchange took place:
PLAINTIFF COUNSEL: [W]e do intend to put on some testimony. I can put that testimony on now or I can put it on after I've made my argument if the Court prefers.
THE COURT: These are Motions. I don't know that we need to extend it because if you start putting on witnesses, you may as well bring all the heirs in, you know. So, let's stay with the legal arguments.
PLAINTIFF COUNSEL: Well, I still think we have a right because we, at least, can put them up there to say: when did you have knowledge that this occurred. . . .
* * *
THE COURT: Make your argument, then we'll decide.
* * *
PLAINTIFF COUNSEL: Have I put on the brief for testimony?
THE COURT: No, sir.
PLAINTIFF COUNSEL: Okay. Can I say what I was going to put on?
THE COURT: I've heard the legal arguments.
PLAINTIFF COUNSEL: But I was going to put on testimony from the parties saying when they obtained knowledge.
THE COURT: Well, that's understandable based on the allegations in the petition, but this Court's concern is that they waited twenty years. . . .
In Nolan v. Roofing Supply, Inc., 36,403 (La.App.2d Cir.11/26/02), 833 So.2d 1026, the district court declined to take testimony at the hearing on an exception of prescription and sustained the exception. This court found that the district court had committed a legal error on another issue, and because of the legal error, a de novo review was necessary. This court reversed the court's ruling and remanded the matter for an evidentiary hearing, stating:
The trial court's refusal to take evidence on whether [the plaintiff's] claim against [the defendant] was prescribed makes a de novo review by this court impossible. While the parties proffered some depositions, the information therein is inadequate for this court to make a de novo review.
Id. at 1034.
In the instant case, we recognize that plaintiffs were entitled to introduce testimony in opposition to the exception. However, we find that the district court did not abuse its discretion in not allowing the testimony. Such testimony was unnecessary, *739 and the record is adequate for this court to review the district court's ruling. Regardless of when plaintiffs obtained knowledge of Alfred, Jr.'s alleged fraud and ill practices, approximately twenty years elapsed between the dates of the judicial sales of the property and the date the instant suits were filed. Under the facts of this case, we find that the pleadings and documentary evidence contained within the records, along with counsel's arguments at the hearing, were adequate for the district court to make a ruling on the exception of prescription and for this court to review the ruling. Therefore, the trial court did not commit reversible error, and it is unnecessary to remand this matter for an evidentiary hearing.
Annulment of Judgments Authorizing Sales
Plaintiffs contend the judgments authorizing the sales of the estate property were obtained by fraud or ill practices and should be annulled. The district court rejected that argument, finding that the matter has long prescribed and plaintiffs' only hope of reviving the issue was to allege fraud. The court stated, "I'm just not buying it. This Court is not buying fraud. . . ."
LSA-C.C.P. art.2004 provides in pertinent part:
A. A final judgment obtained by fraud or ill practices may be annulled.
B. An action to annul a judgment on these grounds must be brought within one year of the discovery by the plaintiff in the nullity action of the fraud or ill practices.
* * *
The trial court is permitted discretion in deciding when a judgment will be annulled because of fraud or ill practice. Kem Search Inc. v. Sheffield, 434 So.2d 1067 (La.1983); Succession of Lewis, 440 So.2d 899 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1119 (La.1984).
In the instant case, the judgment authorizing the sale of the property in Alfred, Sr.'s estate was entered on June 26, 1986, and the property was sold to Alfred, Jr. on July 3, 1986. In their petition, plaintiffs alleged that a "scheme" was concocted by Alfred, Jr., Ruth and Holley, the attorney for the estate. Columbus, Melvyn and Roosevelt contend they were not aware of the scheme at the time, but they knew that Alfred, Jr. had agreed to convey the property back to the heirs once he was reimbursed the expenses he paid to obtain the property.
By her own admission, Ruth, as a party to the alleged "scheme," had knowledge of the alleged fraud and ill practices prior to the judgment authorizing the sale of the property. Therefore, Ruth's claim prescribed June 1987, one year from the date the judgment was entered.
Columbus, Melvyn and Roosevelt were also aware of the primary purpose of the alleged scheme: the estate would sell the property to Alfred, Jr.; Alfred, Jr. would pay the succession debts; Alfred, Jr. would be reimbursed for his expenses through property rentals; Alfred, Jr. would transfer the property back to the heirs once the debt to him was paid in full. Although these plaintiffs alleged that they were not aware of the alleged fictitious debt and had no knowledge of the fact that the children of the second marriage would be excluded, they were admittedly aware of the primary objective of the alleged scheme. If the allegations of the petition are true, Columbus, Melvyn and Roosevelt were on notice that once Alfred, Jr. was reimbursed for the successions' debts, he would transfer the property back to the heirs. They were also aware that Alfred, *740 Jr. did not do so. During the hearing, plaintiffs' counsel stated on the record that the debts of the succession were paid in 1987.[4] Therefore, plaintiffs should have known in 1987 that Alfred, Jr. had no intention of transferring the property back to them. The suit was not filed until September 13, 2005, approximately 18 years after plaintiffs should have obtained knowledge of the alleged fraud and ill practices.
Moreover, notwithstanding the judicial confession, plaintiffs alleged in their petition that Alfred, Jr. received, at a minimum, $3,000 a year in rental proceeds from the property of Alfred, Sr.'s estate. Therefore, if a $40,000 debt was owed to Alfred, Jr., the debt should have been paid in full in less than 14 years (by the late 1990s). If plaintiffs' allegations that Alfred, Jr. only actually paid $19,000 for the property are accepted as true, the debt should have been paid in less than seven years after the transaction (by 1993). Therefore, once the debt was paid in full, plaintiffs should have known, at the very latest, by the late 1990s, that they had been "defrauded," and Alfred, Jr. did not intend to return the property to them. Thus, assuming, without deciding, that the judgments were obtained through fraud or ill practices, the actions have prescribed, as they were not filed within one year of the judgment or within one year from the time that the plaintiffs discovered the alleged fraud or ill practices.
With regard to Arpolian's succession, Ruth alleged in her petition that at the time of Arpolian's death, the other heirs were unable or unwilling to contribute to the payment of the debts of the estate. Alfred Jr. paid the debts, totaling $25,000. Ruth alleged that she and Alfred, Jr. agreed that he would purchase the property of the estate and would hold title as security until he was reimbursed for the debts of the estate. Once Alfred, Jr. acquired the property, Ruth would make an initial payment to him of $10,000, and Alfred, Jr. would transfer title of the property to her. Ruth agreed to continue to pay Alfred, Jr. $2,000 per year from the crop rent she received until the remaining $15,000 was paid. Ruth would then redistribute the property to her co-heirs, once each heir reimbursed his or her share of the funds Ruth had paid. Alfred, Jr. also agreed to grant a 15-year option to purchase the property in favor of Ruth for $25,000. According to Ruth, Alfred, Jr. then took the documents with him to California to be executed by him and his wife, Rose. Rose never signed the documents, and the option to purchase was never executed by any of the parties.
The judgment authorizing the sale of the property was signed on November 5, 1987, and the property was sold by cash deed on September 16, 1988. The document entitled "Declaration by Parties to Option to Purchase" was signed by Ruth and Alfred, Jr. on September 9, 1988. In her petition, Ruth alleged that she became aware of Rose's refusal to sign the declaration "soon after the Cash Sale Deed was complete." Ruth further averred that she received $2,000 in rental proceeds the first two years after the sale, and each year thereafter, *741 Alfred, Jr. received $2,000 in rental proceeds.
Accepting Ruth's allegations as true, she retained the rental proceeds from September 1988 through September 1990, and Alfred, Jr. received them thereafter. If a $25,000 debt was owed to Alfred, Jr., the debt should have been paid in full in approximately 12 ½ years (by April 2003). Therefore, Ruth should have known in early 2003 that Alfred, Jr. did not intend to return the property to her (or the other heirs). This action was not filed until September 13, 2005. Therefore, Ruth's claim that the judgment with regard to Arpolian's estate was obtained through fraud and ill practices has prescribed.
Absolute Nullity of Contracts of Sale
Plaintiffs also contend the sale of the properties to Alfred, Jr. were absolute nullities, urging a myriad of reasons, including the sales were simulations; consent to the sales was vitiated by fraud; and failure of consideration. An action for annulment of an absolutely null contract does not prescribe. LSA-C.C. art.2032.
Simulation
A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties. LSA-C.C. art.2025. There are two types of simulations: absolute and relative. In an absolute simulation, which is sometimes called a pure simulation or non-transfer, the parties do not intend that their contract have an effect between them. LSA-C.C. art.2026. In an absolute simulation, the parties pretend to transfer property from one to the other, but they intend that the transferor retain ownership. Owen v. Owen, 336 So.2d 782 (La.1976); Trident Oil & Gas Corp. v. John O. Clay Exploration, Inc., 622 So.2d 1191 (La.App. 2d Cir. 1993),; Bonnett v. Mize, 556 So.2d 228 (La.App. 2d Cir.1990). "A simulated sale does not transfer property, and it occurs where the parties have no good faith intent to transfer ownership. It is a sham, and as a result, an absolute nullity." Wilson v. Progressive State Bank & Trust Co., 446 So.2d 867, 869 (La.App. 2d Cir.1984).
In the instant case, the parties' allegations in their petitions belie their contention that the sales of the succession property to Alfred, Jr. were simulations. It is undisputed that the parties intended the contracts to have an effect between them. In both petitions, plaintiffs alleged that they petitioned the court to sell the property to ensure that the debts of the estates were paid, and Alfred, Jr. purchased the property. There were no allegations that the transferors, i.e., the decedents' estates, intended to maintain ownership of the property.
Moreover, the law is clear: a transaction will not be set aside as a simulation if any consideration supports the transaction because the reality of the transference is thus established. Russell v. Culpepper, 344 So.2d 1372 (La.1977); Trident Oil & Gas, supra. In this case, plaintiffs alleged that Alfred, Jr. purchased the property in Alfred, Sr.'s estate for $40,000, and he purchased the property in Arpolian's estate for $25,000. Moreover, the cash sale deeds in the record reveal that Alfred, Jr. paid the stated consideration in order to obtain the property. Thus, we find that plaintiffs' argument that the sales were simulations and, therefore, absolutely null, is without merit.
Fraud
Plaintiffs also contend that the sales of the properties to Alfred, Jr. were absolutely null because consent to the sales was vitiated by fraud. According to plaintiffs, they would not have agreed to allow Alfred, Jr. to purchase the properties had *742 they known he would not return the land to the heirs once the debts were paid.
A contract is formed by the consent of the parties established through offer and acceptance. LSA-C.C. art.1927. Consent may be vitiated by error, fraud, or duress. LSA-C.C. art.1948. Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. LSA-C.C. art.1953. A contract is null when the requirements for its formation have not been met. LSA-C.C. art. 2029. As stated above, an action for annulment of an absolutely null contract does not prescribe. LSA-C.C. art.2032.
Fraud cannot be predicated on unfulfilled promises or statements as to future events. Sun Drilling Products Corp. v. Rayborn, XXXX-XXXX (La.App. 4th Cir.10/3/01), 798 So.2d 1141, writ denied, 2001-2939 (La.1/25/02), 807 So.2d 840; Badalamenti v. Jefferson Guar. Bank, 99-1371 (La.App. 5th Cir.4/25/00), 759 So.2d 274; Bass v. Coupel, 93-1270 (La.App. 1 Cir. 6/23/95), 671 So.2d 344, writ denied, 95-3094 (La.3/15/96), 669 So.2d 426; Dutton & Vaughan, Inc. v. Spurney, 600 So.2d 693 (La.App. 4th Cir.1992), writ denied, 601 So.2d 663 (La.1992); Watermeier v. Mansueto, 562 So.2d 920 (La.App. 5th Cir. 1990). The mere failure to do what one promises in order to induce another to sign a contract is not fraud but a mere breach of promise. Dutton & Vaughan, supra; Green v. Louisiana Highway Commission, 3 So.2d 236 (La.App. 1st Cir.1941). Statements promissory in their nature and relating to future actions do not constitute actionable fraud. To constitute actionable fraud, the false statements, if such are made, must relate to facts then existing or which have previously existed. Bass, supra; Swann v. Magouirk, 157 So.2d 749 (La.App. 2d Cir.1963); Franzella Realty, Inc. v. Kolb, 152 So.2d 837 (La.App. 4th Cir.1963).
In the instant case, plaintiffs' allegations essentially center around Alfred, Jr.'s failure to fulfill his promise of redistributing the property to his siblings once the debt to him was paid in full. However, rather than returning the property to the heirs, Alfred, Jr. transferred the property to the Trust. While Alfred, Jr.'s alleged failure to fulfill his promise may constitute a breach of promise, such act is not legal fraud. Therefore, we find that plaintiffs' argument that consent was vitiated by fraud, and therefore, the sales were absolutely null is without merit.
Failure of Consideration
Plaintiffs also contend the contract to sell the property in Alfred, Sr.'s estate to Alfred, Jr. was null because the consideration for the purchase was inadequate.
If property has been sold for a woefully inadequate consideration, then the sale would be absolutely null. Actual value is the value at which the property could reasonably be expected to sell at the time. Middle Tennessee Council, Inc. v. Ford, 274 So.2d 173 (La.1973); Succession of Lewis, 440 So.2d 899 (La.App. 2d Cir. 1983), writ denied, 443 So.2d 1119 (La. 1984). Value is a question of fact and is best left to the discretion of the trial court. Id.
A sale will not be set aside for inadequacy of price unless the inadequacy be so great as to shock the conscience, or unless there be additional circumstances against its fairness. If the inadequacy of price is so gross as to shock the conscience, or if, in addition to gross inadequacy, the purchaser has been guilty of any unfairness, or has taken any undue advantage, or if the owner of the property, *743 or party interested in it, has been, for any other reason, misled or surprised, then the execution sale will be regarded as fraudulent and void, or the party injured will be permitted to redeem the property sold. Graffam v. Burgess, 117 U.S. 180, 6 S.Ct. 686, 29 L.Ed. 839 (1886).
In the instant case, as stated above, the sworn descriptive list in Alfred, Sr.'s estate valued the property at $120,000, but the property was sold to Alfred, Jr. for $40,000. Furthermore, plaintiffs alleged that Ruth returned $20,538.83 to Alfred, Jr., and therefore, Alfred, Jr. only paid approximately $19,000 for the property.
In Middle Tennessee Council, supra, the property at issue was appraised at approximately $35,000 and was conveyed by a court approved sale for that amount. The plaintiff filed suit to rescind the sale, arguing that the sale was an absolute nullity based on lesion. Plaintiff's appraisers opined that the property was valued at approximately $500,000 to $600,000. The Supreme Court found that the expert testimony was sufficient to establish that $35,000 was a fair price and represented the actual value of the interest conveyed. Therefore, the court concluded there was no basis for nullity.
In this case, the sworn descriptive list contained in Alfred Sr.'s probate proceedings valued the property at $120,000. However, plaintiffs have presented no other evidence to show the actual market value of the property at the time of the sale. There is no evidence or allegation that the property was appraised before the estimated value of the property was entered in the descriptive list. Moreover, at the time of the sale, plaintiffs had knowledge of the sale price, as well as the estimated value of the property. Plaintiffs were also aware that each legatee received only $600 from the cash available after the payment of the debts. Plaintiffs admittedly agreed to allow Alfred, Jr. to purchase the property for $40,000 and did not object at the time of the sale or in the twenty years since the sale. For this reason, we reject plaintiffs' claim that the consideration paid for the property was inadequate.
With regard to Arpolian's estate, Ruth alleged that the sale of the property should be "rescinded for failure of consideration because the Option to Purchase was given in consideration of [her] consent to allow the property to be sold" to Alfred, Jr. and Rose. According to Ruth, the option to purchase was a suspensive condition and the sale was contingent upon the parties executing the option.
As noted above, the record contains a document styled "Declaration by Parties to Option to Purchase," signed by Ruth and Alfred, Jr. on September 9, 1988. In the document, the parties "declared and acknowledged that they anticipate executing an option to purchase in which [Alfred, Jr. and Rose] will grant unto [Ruth] the option, for fifteen years from September 1, 1988, to purchase, for $25,000 cash the [the property at issue]." The document also stated that Ruth and Alfred, Jr. "hereby obligate themselves to execute the option, a copy of which is attached hereto." The declaration further provided that Alfred, Jr. and Rose were "obligated to execute the Option to Purchase . . . immediately upon the completion of the purchase . . . of the property" from Arpolian's estate, "with [Ruth] being hereby granted a continuing right of specific performance, to have the said option to purchase executed by [Alfred, Jr. and Rose] at that time." As noted above, the declaration was signed by Alfred, Jr. and Ruth but was never signed by Rose.
*744 In the document entitled "Option to Purchase," Alfred, Jr. agreed to grant Ruth "the exclusive right, privilege or option to purchase" the property for $25,000 for a period of 15 years, commencing September 1, 1988. The document further provided, "In the event [Ruth] desires to exercise the option herein granted, she shall send a certified letter to [Alfred, Jr. and Rose] addressed to them at their address. . . ." The option to purchase was never executed by any of the parties, and there is no allegation that Ruth ever attempted to exercise the option.
It is clear from the language of the documents in the record that Ruth could have demanded specific performance of Alfred, Jr.'s agreement to execute the option to purchase. However, she failed to do so. In fact, she never even executed the option herself. Ruth has known since 1988 that she and Alfred, Jr. never executed the option, and she admitted that she discovered soon after the sale of the property to Alfred, Jr. that Rose had refused to sign the documents. Ruth's prescriptive period to demand specific performance of the obligation to execute the option began to toll "immediately upon" the purchase of the property by Alfred, Jr.
An action on a contract is governed by the prescriptive period of ten years for personal actions. LSA-C.C. art. 3499; Roger v. Dufrene, 613 So.2d 947 (La. 1993); Good v. Laird, 41,205 (La.App.2d Cir.6/30/06), 935 So.2d 809; Chandler v. Kenyan, 38,084 (La.App.2d Cir.12/19/03), 862 So.2d 1182. Therefore, the prescriptive period for Ruth to demand specific performance commenced September 16, 1988, the date Alfred Jr. purchased the property. Her right to enforce the agreement expired on September 16, 1998.
Additionally, Ruth's purported option to purchase commenced on September 1, 1988 and expired in 15 years, September 1, 2003. There is no allegation that Ruth ever paid the agreed upon $25,000 to purchase the property from Alfred, Jr. For these reasons, this argument lacks merit.

CONCLUSION
For the foregoing reasons, the district court's judgment sustaining the peremptory exception of prescription is hereby affirmed. Costs of this appeal are to be borne by plaintiffs/appellants.
AFFIRMED.
NOTES
[1] Arpolian had sold a portion of the land to her son, Woodrow Covington.
[2] Ruth resided in the family home with Arpolian and cared for her mother until her death.
[3] Two weeks prior to the hearing on the exceptions, plaintiffs filed amended petitions in both suits, asserting alternative possessory actions. The district court reserved plaintiffs' rights to assert the possessory actions at a later date. Additionally, the court did not address defendants' reconventional demands. Therefore, those issues are not before this court at this time.
[4] A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. LSA-C.C. art. 1853. A judicial confession is a party's explicit admission of an adverse factual element and has the effect of waiving evidence as to the subject of the admission  of withdrawing the subject matter of the confession from issue. Cichirillo, supra; Sanders v. Earnest, 34,656 (La. App.2d Cir.7/24/01), 793 So.2d 393; Succession of Poland, 34,291 (La.App.2d Cir.4/4/01), 784 So.2d 701.